# EXHIBIT A

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA<br>by ATTORNEY GENERAL<br>MICHELLE A. HENRY,<br>and representing the Department of<br>Environmental Protection,<br><br>PLAINTIFFS,<br><br>v.<br><br>EIDP, INC., *formerly known as* I.E. DU PONT<br>DE NEMOURS AND COMPANY, THE<br>CHEMOURS COMPANY, THE CHEMOURS<br>COMPANY FC, LLC, CORTEVA, INC.,<br>THE DUPONT DE NEMOURS, INC.,<br><br>DEFENDANTS. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | CIVIL ACTION No. ___<br><br>COMPLAINT |

## COMPLAINT

**AND NOW**, comes the Commonwealth of Pennsylvania,

("Commonwealth"), acting by and through Attorney General Michelle A. Henry and

the Pennsylvania Department of Environmental Protection ("PA DEP"), and brings

this action to permanently enjoin and recover penalties and damages for injury to the

Commonwealth's public natural resources, including the economic impact to the

Commonwealth and its residents from loss of use, value, benefits, ecological

services, or other injuries resulting from the conduct alleged herein; an award of past,

present, and future costs to investigate, assess, analyze, monitor, remediate, restore,

3

and/or replace natural resources injured due to defendants' conduct; and any other damages, including punitive or exemplary damages, as permitted by law.

TABLE OF CONTENTS

I.      INTRODUCTION ................................................................8

II.     NATURE AND SCOPE OF RELIEF SOUGHT .........................................12

III.    JURISDICTION ...............................................................14

IV.     PARTIES ....................................................................14

        A. PLAINTIFFS ..............................................................14

        B. DEFENDANTS .............................................................16

V.      FACTUAL ALLEGATIONS ........................................................22

        A. DEFENDANTS' PFAS CONTAINED IN AFFF ARE HARMFUL AND
           THREATEN HUMAN HEALTH, SAFETY AND THE
           ENVIRONMENT..............................................................22

           1. PFAS: CHEMICAL AND PHYSICAL CHARACTERISTICS ....23

           2. AFFF: INTENDED USE OF PFAS-CONTAINING AFFF RESULT
              IN WIDESPREAD RELEASE OF PFAS INTO THE
              ENVIRONMENT .........................................................24

           3. PFAS-CONTAINING AFFF: HEALTH AND ECOLOGICAL
              EFFECTS ...............................................................31

        B. DEFENDANTS' ROLE IN DEVELOPMENT, MANUFACTURE, SALE
           AND PROMOTION OF PFAS...................................................36

        C. DEFENDANTS' CAMPAIGN OF DECEPTION: WHAT THEY KNEW
           AND WHEN THEY KNEW IT…………………………….................38

           1. DEFENDANTS KNEW FOR DECADES THAT PFAS
              CHEMICALS CARRIED RISKS OF HARM TO THE
              ENVIRONMENT AND TO HUMAN HEALTH. ........................38

           2. DEFENDANTS ACTIVELY CONCEALED ADVERSE
              INFORMATION AND RESISTED CALLS TO CONDUCT
              FURTHER STUDIES AS THEY CONTINUED TO PROFIT......42

           3. DEFENDANTS' CAMPAIGN OF DECEPTION:  THE MESSAGE
              ...........................................................................47

(a) Defendants failed to disclose critical information thereby creating a likelihood of confusion or misunderstanding. ....48

4. DEFENDANTS THROUGH TRADE ASSOCIATIONS DECEIVED AND MISLED THE GOVERNMENT AND THE PUBLIC ABOUT THE NATURE AND EFFECTS OF THEIR PFAS .......................48

D. OLD DUPONT'S FRAUDULENT SCHEME TO ISOLATE ITS VALUABLE ASSETS FROM ITS PFAS LIABILITY ..........................52

E. USE OF PFAS-CONTAINING AFFF IN PENNSYLVANIA ...............59

   1. U.S. DOD USE OF PFAS-CONTAINING AFFF ........................60

   2. OTHER USES OF PFAS-CONTAINING AFFF ...........................61

F. AFFF CONTAMINATED SITES IN PENNSYLVANIA .......................63

   1. US DOD SITES ................................................................64

      (a) Willow Grove Military Facilities .........................................65

      (b) Other DOD sites ..................................................................72

   2. OTHER AFFF CONTAMINATION SITES IN PENNSYLVANIA....................................................................75

      (a) Airports................................................................................75

      (b) Surface waters and fish .......................................................77

      (c) Drinking water systems .......................................................81

      (d) AFFF Manufacturing Site .............................…………. 83

      (e) Other sites ..........................................................................83

   3. COMMONWEALTH RESPONSE ..............................................86

VI. CAUSES OF ACTION..........................................................................89

   COUNT ONE .......................................................................................89

   COUNT TWO ......................................................................................96

   COUNT THREE....................................................................................98

   COUNT FOUR.....................................................................................102

COUNT FIVE..........................................................................................104

VII. <u>JURY DEMAND</u> ........................................................................................107

I.    <u>INTRODUCTION</u>

1.    The Commonwealth of Pennsylvania is facing substantial danger from an environmental and public health threat created by defendants' contamination of the Commonwealth's public natural resources caused by decades long use of dangerous aqueous film-forming foams ("AFFFs"), a substance used to fight high hazard fires throughout Pennsylvania.

2.    Defendants manufacture the toxic per- and polyfluoroalkyl substances ("PFAS") contained within AFFF products. PFAS are a family of chemicals resistant to metabolic and environmental degradation, such that these "forever chemicals" persist in the environment and in the human body, leading to bioaccumulation.[1]  When mixed with water, and used as intended, PFAS-containing AFFF is discharged onto the ground, easily migrating through runoff and through the soil to surface waters, groundwater, and aquifers – all sources of drinking water.

3.    The U.S. Environmental Protection Agency ("U.S. EPA") recently found that human exposure to extremely low levels of various PFAS is associated with numerous adverse health impacts – including interference with the endocrine system and the immune system, that these toxins are likely to be

---

[1] The term "bioaccumulate" is defined as the concentration of a substance in a living thing; the term "biomagnify" is defined as the concentration of a toxin in the tissues of an organism at successively higher levels in a food chain.  Simply put, a human body readily absorbs this type of chemical but then rids itself of the chemical only over a long period of time.

carcinogenic to humans, cause other diseases and impairments, and diminished responsiveness to vaccines.[2] Defendants' PFAS contained in AFFF products used throughout and/or manufactured in Pennsylvania exposed Pennsylvania's residents, including firefighters and military personnel, to their toxic PFAS, putting residents at risk of harm.

4.     Based upon these recent findings, in March 2023, the U.S. EPA proposed extremely low enforceable drinking water standards for six PFAS, including those PFAS manufactured, sold and/or used by defendants.[3] U.S. EPA's proposed drinking water standards are analogous to one drop of PFAS in many Olympic sized swimming pools.

5.     This PFAS menace went largely undetected by the Commonwealth and the public in Pennsylvania until 2013 and 2014, when U.S. EPA for the first time required public drinking water systems to conduct testing for PFAS.

---

[2] *See* U.S. EPA health assessments at: USEPA (2023). Public Comment Draft - Toxicity Assessment and Proposed Maximum Contaminant Level Goal for Perfluorooctanoic Acid (PFOA) in Drinking Water. https://www.regulations.gov/document/EPA-HQ-OW-2022-0114-0915; USEPA (2023). Public Comment Draft: Toxicity Assessment and Proposed Maximum Contaminant Level Goal for Perfluorooctane Sulfonic Acid (PFOS) in Drinking Water. USEPA, Office of Water, Health and Ecological Criteria Division, EPA Document Number: EPA 822P23007. March 2023. https://www.regulations.gov/document/EPA-HQ-OW-2022-0114-0953

[3] *Preliminary Regulatory Determination and Proposed Rule; PFAS National Primary Drinking Water Regulation Rulemaking*, 88 Fed. Reg. 18638 (March 29, 2023). In this 2023 rulemaking, U.S. EPA proposed enforceable drinking water standards for six PFAS: PFOA, PFOS, GenX, PFHxS, PFNA and PFBS. U.S. EPA's proposed PFOS and PFOA maximum contaminant level goals (set without considering cost) were proposed at zero. For more details on the types of PFAS, see *infra*.

One particularly egregious example of contamination discovered during this testing is the PFAS-contaminated drinking water found in and around the Naval Air Station Joint Reserve Base at Willow Grove in Horsham Township and the Naval Air Development Center in Warminster Township (collectively the "Willow Grove Military Facilities"), which had some of the highest levels of PFAS contamination of any site in the United States, thus exposing Pennsylvanians to what U.S. EPA found to be "imminent and substantial endangerment."[4]  The contamination at the Willow Grove Military Facilities resulted from the U.S. Department of Defense's ("U.S. DOD") use of defendants' PFAS contained in AFFF over the past decades.

6.      Each defendant is a chemical company that designed, manufactured, marketed, and sold PFAS to AFFF manufacturers for use in AFFF products which are to be used to fight fires in the Commonwealth including, but not limited to, at airports and military and industrial facilities.

7.      Despite decades-long knowledge of the dangers that the intended use of their PFAS products present, defendants did not reveal these dangers to the

---

[4]In 2014, U.S. EPA issued an administrative order directing the U.S. Navy to address PFAS in three drinking water supplies at or near these facilities. In the order, U.S. EPA found that the PFAS levels in several Pennsylvania communities constituted 'imminent and substantial endangerment' as those terms are defined by the federal cleanup law. In 2015, U.S. EPA issued an order directing the Air Guard/Air Force to treat onsite drinking water wells and to provide treatment for private offsite wells https://sgp.fas.org/crs/misc/R45793.pdf. The public drinking water utilities including one in Horsham, PA, detected PFAS chemicals at more than 44 million parts per trillion in 2014 – thousands of times higher than U.S. EPA's health advisory level for PFAS then in effect. *See* stateimpact.npr.org/Pennsylvania/2019/05/06/pfas-chemicals-have-contaminated-17sites-in-pennsylvania-data-shows.

government or the public and continued to design, manufacture, market, promote, sell and/or distribute these PFAS to AFFF manufacturers for use in AFFF products throughout the Commonwealth, including to be used by entities such as counties, municipalities, airports, fire departments, businesses, and others.

8.    Defendants' unlawful deceptive actions have caused and/or contributed to harmful PFAS contamination of the Commonwealth's public natural resources.

9.    The contamination of the Commonwealth's public natural resources, including its drinking water sources, other resources held in trust, and/or property otherwise owned by the Commonwealth, from defendants' persistent chemicals requires massive effort and expenditure of funds to investigate, treat, and remediate, including funds to supply potable water to large numbers of Pennsylvanians.[5]

10.    Addressing this contamination has and will continue to cost the Commonwealth many millions of dollars – costs that ought to be borne by defendants and not the Commonwealth or its residents.

11.    Due to past practices and failure to prevent continuing migration, defendants' toxic chemicals continue to be released and continue to migrate in

---

[5] Herein, the term "public natural resources" or "natural resources" includes, but is not limited to, groundwater, surface water, sediments, soils, and biota, including fish and wild game and other such resources owned, managed, held in trust by the Commonwealth.

11

Pennsylvania's environment from AFFF contamination at the Willow Grove Military Facilities and from AFFF contamination at various other facilities and sites throughout the Commonwealth.

## II.    NATURE AND SCOPE OF RELIEF SOUGHT

12.    The Commonwealth brings this action seeking redress for injuries and the threat of future injuries to the Commonwealth's public natural resources, property, residents and consumers resulting from defendants' PFAS contained in AFFF products which are and/or were used widely throughout Pennsylvania. The Commonwealth seeks to recover damages from defendants, including but not limited to, monies expended by the Commonwealth and its agencies to investigate and remediate these injuries and/or threats to public health, the environment, and public natural resources as a result of releases of defendants' toxic products into the environment.

13.    The Attorney General representing the Commonwealth brings this action pursuant to the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1, *et seq.* (hereinafter "Consumer Protection Law") to permanently enjoin, as well as recover restoration, restitution,  penalties and other appropriate relief for violations of the Consumer Protection Law against defendants related to deceptive and fraudulent trade practices in connection with their promotion,

advertisement, offer for sale, sale, and distribution of PFAS to AFFF manufacturers including manufacturers located in Pennsylvania to be used in the manufacture of AFFF products and as deemed unlawful by § 201-3 of the Consumer Protection Law.

14.    At present, the Commonwealth continues to investigate PFAS-containing AFFF contamination within its borders.

15.    Because the extent of the damage is not fully known, this action seeks to require defendants to pay all Commonwealth costs necessary to fully investigate, remediate, assess and restore the various locations throughout Pennsylvania where their PFAS and/or their PFAS contained in AFFF products were transported, stored, used, handled, released, spilled, and/or disposed of including all areas affected by defendants' products.

16.    The Commonwealth seeks all damages that the Commonwealth is entitled to recover, including, but not limited to, damages for injuries to all of the Commonwealth's public natural resources, property damage to government owned properties, economic damages, restitution and disgorgement of defendants' ill-gotten profits, punitive damages, recovery of past costs already incurred and future costs to be incurred, and all other damages, fees, costs and equitable relief to which it may be entitled.

17.    In support of this action, the Commonwealth respectfully represents the following:

13

III.    JURISDICTION

18.    This Court has jurisdiction over this action pursuant to 42 Pa.

C.S.A. § 761.

19.    This Court has jurisdiction over defendants in this action pursuant

to 42 Pa. C.S.A. § 5322 because defendants have, among other things, conducted

business in this Commonwealth and caused injury throughout Pennsylvania.

20.    The public natural resources and properties that are the subject of

this suit all rest within the Commonwealth.  No federal subject matter jurisdiction

exists or is invoked herein.

IV.    PARTIES

A. PLAINTIFFS

21.    Plaintiff is the Commonwealth of Pennsylvania, by Attorney

General Michelle A. Henry, through the Public Protection Division, Strawberry

Square, 14th Floor, Harrisburg, PA 17101.

22.    The Attorney General is the chief law enforcement officer of the

Commonwealth and brings this action pursuant to the Commonwealth Attorneys Act,

71 P.S. § 732-204(c), pursuant to Art. 1, Section 27 of the Pennsylvania Constitution,

Pa. Const., Art. I, § 27, and pursuant to the Consumer Protection Law.

23.    The Commonwealth holds in trust and must preserve for the

benefit of its citizens the Commonwealth's public natural resources. Pa. Const., Art. I, § 27.  The protection of the Commonwealth's public natural resources from environmental contamination and degradation and the Commonwealth's interest in ensuring the health and well-being of its citizens, environment and economy and the free use of its public natural resources by Commonwealth citizens are essential public functions of the Commonwealth trustees.

24.    As trustee of the Commonwealth's public natural resources, the Commonwealth has trustee standing and is empowered to bring suit to protect the corpus of the trust for the beneficiaries of the trust.  The Commonwealth brings this action as trustee of the public natural resources pursuant to Pa. Const., Art. I, § 27 and pursuant to its police powers which include without limitation the powers to prevent and abate pollution of the public natural resources of the Commonwealth.

25.    The Commonwealth also brings this action pursuant to its inherent *parens patriae* authority to remedy an injury to its "quasi-sovereign interest" in the physical and economic health and well-being of its citizens and in preserving its public natural resources.

26.    Further, the Commonwealth has a quasi-sovereign interest in seeking damages under the Consumer Protection Law and has such an interest in the abatement of public nuisances to prevent injury or potential injury to its citizens' general health and well-being.

27.    PFAS contamination attributable to defendants' PFAS contained in AFFF which AFFF was used and/or manufactured in Pennsylvania constitutes injury to the Commonwealth's public natural resources and other property, for which Plaintiff seeks damages and other relief, including on behalf of the Commonwealth and on behalf of its residents as trustee of the Commonwealth's public natural resources, pursuant to its police powers, and through its agencies, under *parens patriae* authority.

28.    PA DEP is a department within the Executive Branch of the Commonwealth government, vested with authority to protect the environment, abate, prevent and remediate pollution, and protect the public health, comfort, safety and welfare against violations of its environmental laws pursuant to its: police powers; PA. Const., Art. I, § 27 trustee obligations; and *parens patriae* authority under the Clean Streams Law of Pennsylvania, Act of June 22, 1937, P.L. 1987, *as amended*, 35 P.S. §§ 691.1- 691.1001, and under the Pennsylvania Hazardous Sites Cleanup Act, Act of October 18, 1988, P.L. 756, *as amended*, 35 P.S. §§ 6020.101- 6020.1305.

## B. DEFENDANTS

29.    Defendants designed, manufactured, formulated, marketed, promoted, distributed and/or sold PFAS to be supplied to AFFF manufacturers which use defendants' PFAS to manufacture AFFF which when used contaminates

16

Pennsylvania's public natural resources.

30.    E.I. du Pont de Nemours and Company, Inc., referred to here as Old DuPont, is a Delaware corporation with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805.  At all times relevant and material hereto, Old DuPont has done and continues to do business throughout the United States, including in Pennsylvania. On January 1, 2023, E.I. DuPont de Nemours and Company, Inc. changed its name to EIDP, Inc., consistent with its contractual obligations related to its separation from DowDuPont, Inc. E.I. du Pont de Nemours and Company is a wholly owned subsidiary of Corteva, Inc.

31.    Defendant The Chemours Company ("Chemours") is a Delaware corporation with its principal place of business at 1007 Market Street, Wilmington, Delaware 19899.  From April 2015 until July 2015, Chemours was a wholly owned subsidiary of Old DuPont. In July 2015, Old DuPont spun off its performance chemicals business, including its PFAS business, to Chemours, along with significant environmental liabilities. Chemours is registered to do business in the Commonwealth.

32.    Chemours' wholly owned subsidiary, Chemours Company FC, LLC, ("Chemours FC") has its principal place of business located at 1007 Market Street Wilmington, Delaware, 19899 and is registered to do business in Pennsylvania. Chemours FC manufactured, marketed, promoted, distributed and/or sold PFAS

17

throughout the United States, including in Pennsylvania, which was used in the manufacture of AFFF.

33.    At all relevant times, Chemours and Old DuPont manufactured, marketed, designed, promoted, distributed, sold, released, supplied, transported, and arranged for sale and/or use of PFAS which was an essential ingredient in AFFF which was used in Pennsylvania as intended for decades. Chemours and Old DuPont's toxic raw chemical product, PFAS, was sold to AFFF manufacturing companies in Pennsylvania, which used it to manufacture AFFF, which was then used in Pennsylvania.

34.    On information and belief, Chemours and Old DuPont's PFAS were discharged into the environment at or from numerous sites throughout Pennsylvania by use of AFFF into which Chemours and/or Old DuPont's PFAS was incorporated.

35.    The PFAS contamination attributable to Chemours and Old DuPont constitutes injury to the Commonwealth's public natural resources and other property for which the Commonwealth seeks damages and other relief, on behalf of the Commonwealth and on behalf of its residents as trustee of the Commonwealth's public natural resources through its Art. I, § 27 obligations, through its police powers and pursuant to its *parens patriae* authority.

36.    Chemours and Old DuPont engaged in trade and commerce within

the Commonwealth by offering for sale, promoting and selling a toxic product that poses a serious threat to the Commonwealth and to its citizens.

37.     Chemours and Old DuPont directed, supervised, controlled, approved, formulated, authorized, ratified, benefited from, profited by and/or otherwise participated in the acts and practices hereinafter alleged.

38.     The Commonwealth avers that Chemours and Old DuPont are using, have used or are about to use methods, acts or practices declared unlawful by § 201-3 of the Consumer Protection Law.

39.     After the 2015 Chemours spin off, Old DuPont merged with the Dow Chemical Company ("Dow"), creating DowDuPont Inc. Thereafter, DuPont and Dow each became subsidiaries of the holding company, DowDuPont. Subsequently, DowDuPont divided its business into independent companies: Dow Inc., Corteva, Inc., and DuPont de Nemours, Inc.  Old DuPont is now a subsidiary of Corteva, Inc. DowDuPont changed its name to DuPont de Nemours, Inc.

40.     Defendant DuPont de Nemours Inc. is a Delaware corporation with its principal place of business at 974 Centre Road, Building 730, Wilmington, Delaware 19805. DuPont de Nemours Inc. retains assets not assumed by Corteva, Inc. from the Old DuPont.

41.     Corteva, Inc. ("Corteva") is a corporation organized and existing under the laws of Delaware with its principal place of business located at 9330

19

Zionsville Road, Indianapolis, Indiana 46268. In 2019, Corteva was spun off from DowDuPont into a separate company. Corteva is now the direct parent corporation of Old DuPont; upon information and belief, Corteva is believed to have assumed liabilities and assets from Old DuPont. Corteva is registered to do business in Pennsylvania.

42.    Upon information and belief, defendants have sold and provided their PFAS products to the current and former owners, possessors, and/or operators of an AFFF manufacturing facility located at 350 East Union Street, West Chester, Pennsylvania that manufactured, used, sold, processed, stored, handled, transported, discharged, released and/or disposed of PFAS-containing AFFF. These PFAS-containing AFFF products were/are sold, used and discharged into the environment throughout Pennsylvania.  PFAS discharges at the West Chester facility occurred through various practices and mechanisms such as releases during manufacture, storage, transfer or operational requirements that mandate periodic equipment calibration; discharges for apparatus testing; and episodic discharges of AFFF in accidental leaks.

43.    As a result of these releases, and as reported to PA DEP, groundwater monitoring at and surrounding the West Chester PA facility identified concentrations of PFAS contamination significantly higher than the U.S. EPA's March 29, 2023 proposed PFAS drinking water standards.

44.    The Commonwealth avers that defendants and any predecessor, successors and corporate parents directed, supervised, controlled, approved, formulated, authorized, ratified, benefited from, profited by and/or otherwise participated in the acts and practices hereinafter as alleged.

45.    The AFFF manufacturers to which defendants sold their PFAS in turn sold their AFFF to U.S. DOD directly and through third parties. Further, upon information and belief, the AFFF manufacturers to which defendants sold their PFAS then sold and/or sell PFAS-containing AFFF products to airports throughout Pennsylvania.

46.    To the extent any act or omission of any defendant is alleged in this Complaint, the officers, directors, agents, employees, or representatives of such defendant committed or authorized each such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation, or control of the affairs of defendant, and did so while acting within the scope of their duties, employment or agency.

47.    Any and all references to defendants in this Complaint include any predecessors, successors, parents, subsidiaries, affiliates, and divisions and agents of defendants.

## V.    FACTUAL ALLEGATIONS

### A. DEFENDANTS' PFAS ARE HARMFUL AND THREATEN HUMAN HEALTH, SAFETY AND THE ENVIRONMENT

48.    PFAS are a class of human-made chemicals with fully fluorinated strong carbon-chain molecules, which are extremely resistant to metabolic and environmental degradation, such that these "forever chemicals" persist in the environment and in the human body for a long period of time, leading to bioaccumulation. These chemical compounds are not naturally occurring and must be manufactured to exist. PFAS cause a wide array of harmful health effects.

49.    PFAS have been widely used in industry and in a wide array of consumer products since the 1950s, including carpets, clothing, fabrics for furniture, packaging for food, and non-stick cookware that are resistant to water, grease or stains. PFAS are also used in manufacturing firefighting foams.

50.    Until recently, the government, the public and the scientific community working outside PFAS and AFFF manufacturers had very limited understanding of the properties of these chemicals or their potential risks to human health and the environment. Now, in several separate 2022 and 2023 actions, U.S. EPA determined that these substances are hazardous to humans and the environment at extremely low levels.

22

## 1. PFAS: CHEMICAL AND PHYSICAL CHARACTERISTICS

51.    PFAS generally are considered surfactants – fluorosurfactants – a substance that tends to reduce the surface tensions of a liquid in which it is dissolved.

52.    Their water solubility allows them to migrate readily from soil to groundwater.

53.    These chemicals exist as linear and branched isomers. PFAS include both long-chain (with eight or more carbons) and short-chain (with seven or fewer carbons) compounds, including perfluorooctane sulfonic acid ("PFOS"), perfluorooctanoicacid ("PFOA"), perfluorohexane sulfonic acid ("PFHxS"), perfluorononanoic acid ("PFNA"), perfluoroubutane sulfonic acid ("PFBS"), hexafluoroproplylene oxide ("HFPO-DA"), perfluoroheptanoic acid ("PFHpA"), perfluorobutyrate ("PFBA") and perfluorodecanoic acid ("PFDA").



**Example of one PFAS compound**

54.    There are thousands of different PFAS. The two most widely studied of these chemical compounds are PFOA and PFOS, which each contain eight

23

carbon atoms and are manufactured in their salt forms. PFOA and PFOS (the latter

manufactured exclusively by the 3M Company, herein referred to as "3M") have

been produced in the U.S. as well as imported.[6]   These two PFAS are some of the

most basic PFAS.  They are essentially non-degradable and are sometimes referred to

as terminal PFAS or terminal degradation products, meaning no further degradation

products will form from them.

54.     The most common processes for making fluorinated surfactants

are electrochemical fluorination and telomerization.  3M's fluorocarbon surfactants

were made through electrochemical fluorination – a process for which 3M held a

patent.  Defendants developed and use another manufacturing process,

telomerization, which produces PFAS through chemical reactions resulting in PFAS

with various numbers of carbon atoms.

56.     As terminal degradation products, PFOA and PFOS can also be

formed by chemical or biological degradation from a larger group of related PFAS.

PFOA and PFOS thus are formed through the degradation or metabolism of other

fluorochemicals, including those made by defendants from the telomerization

process.

57.     Because the chemicals do not break down further or biodegrade

---

[6] EPA's Proposed Designation of PFOA and PFOS as CERCLA Hazardous Substance, 87 Fed. Reg. at 54418 (September 6, 2022).

over time but instead accumulate in the environment, once these chemicals are released into the environment, they migrate into and cause extensive contamination to drinking water and injury to public natural resources.[7] PFAS leach from the soil into groundwater and surface water where they can travel significant distances and readily contaminate soils, sediments and biota.[8]

58.    Unless they are actively cleaned up from contaminated public natural resources, these chemicals will remain within the natural resources and continue to contaminate these resources indefinitely.[9] Because of widespread contamination, PFAS are now found in many environmental media, in wildlife, and even in the Arctic snow and in the air over the Atlantic Ocean.[10]

59.    Because of the harms PFAS present, most current uses of PFOA and PFOS have been phased out from production starting in the early 2000s, although the contamination from these chemicals remains ubiquitous and some PFOA

---

[7] John A. Simon, Editor's perspective – *Per-and polyfluorinated substances pose substantial challenges to remediation practitioners,* Remediation: The Journal of Environmental Cleanup Costs, Technologies and Techniques, 2018;28:3
https://onlinelibrary.wiley.com/doi/full/10.1002/rem.21547 (March 12, 2018).
[8] *See* U.S. Center for Disease Control ("CDC") website at:
https://www.atsdr.cdc.gov/toxprofiles/tp200-c4.pdf.
[9] PFAS chemicals easily dissolve in water, and thus they are mobile and readily spread in the environment. *See* CDC https://www.atsdr.cdc.gov/pfas/overview.html
[10] *See* EPA's Proposed Designation of PFOA and PFOS as CERCLA Hazardous Substances, 87 Fed. Reg. at 54418 (September 6, 2022). *See also* Designation of PFOA and PFOS as hazardous substances at https://www.epa.gov/newsreleases/epa-proposes-designating-certain-pfas-chemicals-hazardous-substances-under-superfund.

manufacturing, importing and use continues.[11]  Environmental contamination and

resulting human exposure from these two PFAS are anticipated to continue for the

foreseeable future due to their persistence, formation from precursor compounds,

international production, possible domestic production and legacy production in the

U.S.

62. 60.    In response to the phase-out, hundreds of new PFAS with

different chemical compositions were subsequently developed, including those

developed by defendants, and are currently manufactured to replace PFOA and

PFOS.

61.    Defendants considered their GenX (HFPO-DA) as a replacement

for PFOA.

62.    Based on toxicity assessments, the so-called replacement PFAS

are now also associated with significant adverse environmental and health impacts at

low levels, leading to U.S. EPA's 2022 Health Advisories for the DuPont defendants'

GenX chemicals.[12]  To address the harms, on March 29, 2023, EPA proposed

national drinking water standards to establish legally enforceable levels for six PFAS,

---

[11] PFOA and PFOS Stewardship Programs. *See* https://www.3m.com/3M/en_US/pfas-stewardship-us/pfas-history/
[12] *See* June 2022 U.S. EPA Safe Drinking Water Act Lifetime Drinking Water Health Advisories for four Perfluoroalkyl Substances. 87 Fed. Reg. 36848 (June 21, 2022).

including GenX, at extremely low levels.[13]

63.    In addition, some of the replacement PFAS, including those of defendants, breakdown into non-biodegradable PFOA or PFOS (terminal degradation products) in the environment.

### 2. AFFF: INTENDED USE RESULTS IN WIDESPREAD RELEASE OF PFAS INTO THE ENVIRONMENT

64.    Defendants' PFAS are used in manufacturing AFFF firefighting foams. AFFF is a major source of PFAS contamination in the Commonwealth.

65.    AFFF Class B firefighting foams are commercial surfactant solutions designed and used to combat Class B flammable fuel fires. [14]  Class B foams have been and continue to be used for fire suppression, fire training, equipment testing, local community fire departments, and flammable vapor suppression at military installations and civilian facilities and airports as well as at petroleum refineries and bulk storage facility and chemical manufacturing plants.

66.    AFFF products are typically formed by combining hydrocarbon foaming agents with fluorinated surfactants.[15] AFFF-containing PFAS forms foam

---

[13]*Preliminary Regulatory Determination and Proposed Rule; PFAS National Primary Drinking Water Regulation Rulemaking*, 88 Fed. Reg. 18638 (March 29, 2023).
[14] There are several classes of foams. Class A foams were developed to fight wildfires. Class B foams are designed to fight Class B flammable liquid fires.  AFFF is a highly effective type of Class B foam for fighting large liquid fuel fires.
[15] Surfactants (a combination of terms "active" and "surface") are compounds that lower the surface tension between two liquids. Fluorosurfactants are surfactants which contain fluorine atoms.

when mixed with water and ejected from a nozzle. That foam is then sprayed so that it coats a fire, blocking the supply of oxygen feeding the fire and creating a cooling effect and evaporation barrier to extinguish the vapors. A film also forms to smother the fire after the foam has dissipated.

67.    3M's AFFF products, which contained at least PFOA and PFOS, dominated the highly lucrative AFFF marketplace until it announced it would no longer manufacture its AFFF product in 2000.

68.    In or around 1951, defendants began to produce and sell polytetrafluoroethylene, a fluoropolymer, which requires PFOA as a processing aid. DuPont marketed its PTFE under the trade name "Teflon®."

69.    Defendants recognized the significant business opportunity created by 3M's withdrawal from the marketplace.

70.    Defendants began producing PFAS for their own use and for sale in the early 2000s, after 3M ceased PFOA production. Upon information and belief, defendants sold and/or sell PFAS to an AFFF manufacturer located in West Chester, PA.

71.    Thousands of gallons of PFAS are released into the environment with each use of AFFF products when used to train firefighters and for extinguishing fires. Firefighting foams are also released into the environment through various mechanisms such as low-volume release during manufacture, storage, transfer or

28

operational requirements that mandate periodic equipment calibration; moderate-volume discharge for apparatus testing and episodic discharge of AFFF within large aircraft hangars and buildings; occasional, high-volume discharge for firefighting and emergency responses; and accidental leaks.

72.    With each such use, PFAS-containing AFFF enters the water cycle (the continuous movement of water on and below the surface of the earth) through residual soil impacts, runoff and groundwater infiltration.

73.    For decades, these PFAS-containing AFFF products were thus discharged into the environment at or from sites, with each use resulting in contamination of public and private drinking water wells, groundwater, surface waters, sediments and/or biota. The spread of the contamination continues as AFFF continues to migrate.

29



74.    Users of AFFF stockpile it for future use in warehouses because the product is/was advertised by defendants as having a long shelf life. Defendants did not recall their PFAS products, instruct or warn customers or the public to stop using their PFAS products or even explain how to properly dispose of the products. Accordingly, defendants' toxic PFAS contained within AFFF products continue to be stored and used.

75.    Concrete on which AFFF has been repeatedly discharged (such as for training, equipment testing, storage and at AFFF manufacturing facilities) can absorb PFAS, and then release it to groundwater and soils during precipitation

---

[16]Image taken from PA DEP website at:
https://files.dep.state.pa.us/Water/DrinkingWater/Perfluorinated%20Chemicals/Reports/20191205-PFAS-Action-Team-Initial-Report-Pennsylvania.pdf

30

events.[17]

76.    Other environmental sources also exist, including direct industrial discharges of PFAS into soil, air and water at AFFF manufacturing facilities, at landfills and discharges into wastewater treatment plants. Defendants' so-called replacement PFAS — designed to replace PFOS or PFOA — can be transformed into PFOA and PFOS by microbes in soil, sludge and wastewater, and through abiotic chemical reactions.

### 3. PFAS-CONTAINING AFFF: HUMAN HEALTH AND ECOLOGICAL EFFECTS

77.    PFAS have unique properties that cause them to pose significant threats to public health and the environment. These include adverse human health effects, mobility, persistence, and prevalence.[18]

78.    Federal, state and international governmental entities have recognized and taken a wide variety of actions to address the dangers to public health and welfare and the environment posed by PFAS.

79.    By November 2021, U.S. EPA had evaluated more than 400 peer-reviewed studies of PFAS published since 2016. Based upon this analysis, U.S. EPA

---

[17] *See* 87 Fed. Reg. at 54427, citing to Baduel, C.; Paxman, C.J.; Mueller, J.F. (2015). Perfluoroalkyl substances in a firefighting training ground (FTG), distribution and potential future release. J. Hazard Mater 296: 46–53. *https:// www.ncbi.nlm.nih.gov/pubmed/25966923.*

[18] *See* U.S. EPA website at: https://www.epa.gov/newsreleases/epa-proposes-designating-certain-pfas-chemicals-hazardous-substances-under-superfund

determined that science supports the conclusion that exposure to PFOA and PFOS can lead to adverse human health effects.

80.    U.S. EPA and the U.S. EPA Science Advisory Board agree on at least five adverse human health effects associated with PFAS exposure include: decreased vaccine response, delayed growth and development (decreased birth weight), increased cholesterol, increased levels of liver enzyme indicative of liver damage, and kidney and testicular tumors.[19]

81.    Exposure to even small amounts of PFAS chemicals can be toxic and may pose serious health risks to humans and to animals.[20]

82.    U.S. EPA's understanding of the ill effects from exposure to these toxins is developing over the years as reflected by its ever more protective standards. On June 15, 2022, U.S. EPA released four updated PFAS drinking water HALs based on a robust assessment of the best available science at that time, including human epidemiology studies in populations exposed to these chemicals.[21]    EPA issued significantly lower interim health advisories for PFOA and PFOS that superseded U.S. EPA's 2016 HALs for PFOA and PFOS and set new final HALs for two other

---

[19]*See* CDC's website at: https://www.atsdr.cdc.gov/toxprofiles/tp200.pdf; See also June 2022 U.S. EPA Safe Drinking Water Act Lifetime Drinking Water Health Advisories for four Perfluoroalkyl Substances, 87 Fed. Reg. 36848 (June 21, 2022).

[20] *See* EPA's Proposed Designation of PFOA and PFOS as CERCLA Hazardous Substances, 87 Fed. Reg. at 54418 (September 6, 2022).

[21]*See* June 2022 U.S. EPA Safe Drinking Water Act Lifetime Drinking Water Health Advisories for four Perfluoroalkyl Substances. 87 Fed. Reg. 36848 (June 21, 2022).

PFAS – for the DuPont defendants' GenX and for PFBS which were supposed to be a safe replacement for PFOA and PFOS, respectively.

83.     As explained above, these HALs identify concentrations of chemicals in drinking water at or below which adverse health effects are not anticipated to occur. "In light of newly available science and to protect public health," U.S. EPA replaced the 2016 HAL of 70 parts per trillion ("ppt") with an interim HAL for PFOA at 0.004 ppt and for PFOS at 0.02 ppt - nearly undetectable levels.[22] U.S. EPA recommends that entities that detect PFOA and PFOS take steps to reduce exposure.

84.     On August 26, 2022, U.S. EPA proposed designating PFOA and PFOS as hazardous substances under Section 102(a) of the federal Superfund law, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. §§ 9601 et seq. ("CERCLA").[23]

85.     Most recently, reflecting its increased understanding, on March 29, 2023, EPA proposed enforceable national drinking water standards for six PFAS, including those manufactured by defendants. The proposed standards are 4.0 ppt for

---

[22]*See* U.S. EPA website at: https://www.epa.gov/newsreleases/epa-announces-new-drinking-water-health-advisories-pfas-chemicals-1-billion-bipartisan. EPA issued interim HALs for PFOA and PFOS based upon concerns from data from its preliminary findings. EPA's Science Advisory Board ("SAB") is reviewing the data upon which these interim HALS were based. EPA will respond to the SAB comments as it moves forward.

[23]*See* 87 Fed. Reg. 54415 (September 6, 2022).  CERCLA was enacted to promote the timely cleanup of contaminated sites and to ensure that parties responsible for the contamination bear the costs of such cleanups.

PFOA and PFOS and 1.0 Hazard Index for PFNA, PFHxS, PFBS and GenX. (A hazard index is a tool used to evaluate potential health risks from exposure to chemical mixtures.)

86.    As described in detail below, defendants knew of these harms early on. For example, in 1965, Old DuPont conducted a PFAS study on rats which showed liver, spleen and kidney damage such that the U.S. Food and Drug Administration rejected the DuPont defendants' petition to use PFAS as a food additive.

87.    In the human body, PFAS chemicals bioaccumulate/biomagnify in numerous ways. Any newly ingested PFAS will be added to any PFAS already present. In humans, PFAS remain in the body for many years.[24] In mammals, PFAS can bioaccumulate by crossing the placenta from mother to fetus and by passing to infants through breast milk.[25] PFAS biomagnify up the food chain, such as when humans eat fish that have ingested PFOA or PFOS.[26]

88.    New data from human epidemiology studies, animal toxicology studies and studies on mixtures of PFAS continue to become available regarding the toxicokinetic properties of both short-chain and long-chain PFAS. An August 2022 University of California study bolstered the findings that PFAS elevates the risk of

---

[24] *See* CDC website at: https://www.atsdr.cdc.gov/toxprofiles/tp200.pdf
[25] *Id.*
[26] *Id.*

34

liver cancer.[27]

89.    Humans are exposed to PFAS in several ways: through ingestion of contaminated drinking water and contaminated food, inhalation, and dermal contact, among other pathways.[28]

90.    A 2016 study from the Harvard T.H. Chan School of Public Health reported that the drinking water supply of some 6 million U.S. residents exceeded the 2016 U.S. EPA HALs for PFAS.[29]

91.    A study conducted by Pennsylvania Department of Health ("PA DOH") together with the U.S. Center for Disease Control found that Pennsylvanians living in the communities surrounding the Willow Grove Military Facilities have levels of PFAS in their blood serum that indicate additional health screening is necessary and exceed the national average.[30]

---

[27] University of CA study available at this website: https://keck.usc.edu/synthetic-forever-chemical-linked-to-liver-cancer/

[28]*See* CDC website at:  https://www.atsdr.cdc.gov/toxprofiles/tp200.pdf

[29]The U.S. EPA's HALs for PFAS were dramatically lowered over the years as U.S. EPA's understanding of the science increased and more data became available. See *Environ. Sci. Technolo. Lett.* 2016, DOI: 10.1021/acs.estlett.6b00260;
https://pubs.acs.org/doi/abs/10.1021/acs.estlett.6b00260?source=cen

[30]*See* National Academies of Sciences, Engineering, and Medicine (NASEM) guidance document for PFAS exposure, testing, and clinical follow-up from July 2022 at https://www.nationalacademies.org/our-work/guidance-on-pfas-testing-and-health-outcomes#sectionPublications.  *See also* PA DOH study at https://www.health.pa.gov/topics/Documents/Environmental%20Health/PEATT%20Pilot%20Proje ct%20Final%20Report%20April%2029%202019.pdf

B. DEFENDANTS' ROLES IN DEVELOPMENT, MANUFACTURE, SALE
AND PROMOTION OF PFAS PRODUCTS TO BE USED IN AFFF
PRODUCTS

92. . Defendants' PFAS compounds include GenX and/or other PFAS
and/or chemical compounds that degrade into PFOA and/or PFOS.

93.    As described above, starting around 1950, Old DuPont began to
manufacture a fluoropolymer which required PFAS (specifically PFOA) to produce.

94.    To produce this product, Old DuPont purchased PFAS, an
essential product ingredient, from the 3M Company over many decades. Old DuPont
then sold and defendants now sell PFAS containing products to various chemical
companies and AFFF manufacturers. Defendants commonly referred to this PFAS as
C-8.

95.    Old DuPont advanced this area of PFAS chemistry in the 1960s
when it developed fluorinated telomers (also referred to as telomers) – types of PFAS
based on a chain of fluorine and carbon bonds made through a telomerization
process. These fluorinated telomers provided Teflon-like protection against dirt and
grease for textiles, carpets and papers.

96.    Defendants' telomer PFAS were used by AFFF manufacturers to
manufacture AFFF;  the AFFF products were then sold to and used by the U.S. DOD
at facilities across the country, including in Pennsylvania.

97.    One of the toxic fluorinated telomer PFAS that defendants make

36

is called GenX. The Chemours Company now makes GenX at its Fayetteville, North

Carolina plant and uses the chemical at its facilities in New Jersey and West Virginia.

98.    For years, defendants promoted GenX as a safe alternative PFAS

to substitute for PFOS. As explained further below, this promotion was a misleading

deception. In March 2023 U.S. EPA proposed an extremely low drinking water

maximum contaminant level for GenX, after determining that human exposure to the

chemical was dangerous even at extremely low levels.

99.    U.S. EPA, NC, NJ and WV environmental regulators found C-8

and specifically GenX contamination in the ground water and surface waters adjacent

to the DuPont defendants' WV, NJ and NC manufacturing facilities. U.S. EPA and

state environmental regulators have taken enforcement actions and extracted large

penalties from the DuPont defendants for widespread GenX contamination

surrounding these facilities.

100.    After 3M left the AFFF and PFAS market, defendants jumped in

to fill the void and began to process, manufacture and sell PFAS for their own use

and for sale in the early 2000s. Defendants sold PFAS to AFFF manufacturers for

use in AFFF products, including to manufacturers in Pennsylvania, from the early

2000s until recently.

101.    As described below, starting around 1950, defendants investigated

PFAS extensively, generating internal studies and reports on their PFAS related to

37

toxicity, fate and transport and human exposure but failed to timely release this information.

### C. DEFENDANTS' CAMPAIGN OF DECEPTION: WHAT THEY KNEW AND WHEN THEY KNEW IT

102.    Defendants knew and/or should have known their PFAS products were not safe, and were likely to and did contaminate public natural resources within the Commonwealth.

103.    Defendants designed, manufactured, marketed and sold their products as being non-toxic but their products were/are not non-toxic.  Defendants never disclosed or warned of the foreseeable harms associated with the use of their products; instead, defendants affirmatively withheld and/or distorted that information. By concealing, misrepresenting and/or deliberately omitting correct contrary evidence concerning the toxicity and harmfulness of their PFAS products, defendants designed, manufactured, marketed and sold a product into the marketplace in Pennsylvania that was materially different from what defendants represented it to be.

### 1. DEFENDANTS KNEW FOR DECADES THAT PFAS CARRIED RISKS OF HARM TO THE ENVIRONMENT AND TO HUMAN HEALTH

104.    In the early 1950s, Old DuPont knew about the risks of PFAS chemicals to drinking water, the environment, and human health, but actively concealed its knowledge, subverted the science and kept selling and distributing its

AFFF product in the U.S. and, specifically, in Pennsylvania.

105.   Continuing with this deception, notwithstanding their knowledge, defendants publicly stated in 2003 that "We are confident that there are no health effects associated with C-8 (their name for PFAS) exposure," and that "C-8 is not a human health issue."

106.   As early as 1965, Old DuPont scientists' study showed toxicity associated with its PFAS products, including that certain PFAS caused adverse liver reactions in rats.

107.   In November 1961, Old DuPont's chief toxicologist, Dorothy Hood, cautioned in a memo to executives that the substance should be "handled with extreme care." She explained that a new study had found enlarged livers in rats and rabbits exposed to C-8 which suggested the chemical was toxic.

108.   Old DuPont knew about the nature, extent and significance of C-8 and its concentrations and hazards to its employees, the public, and the environment. Old DuPont learned of these hazards as it continued its release of PFAS into the environment at its Washington Works plant in Parkersburg, WV which resulted in the contamination of area drinking water supplies.  (At a trial in a case brought by neighbors of the WV facility, a plaintiff expert testified that DuPont was dumping tens of thousands of pounds of C-8 into the Ohio River.)

109.   In 1973, an Old DuPont study showed liver damage from

39

exposure to PFAS in food packaging.

110. In 1975, Old DuPont warned 3M about "toxic effects" of PFAS in food packaging.

111. In 1978, Old DuPont initiated a program to measure C-8 levels in the blood of workers potentially exposed to C-8 and assessed potential health effects that may be correlated with C-8 exposure. Through this survey, Old DuPont found possible evidence of liver damage. By 1980, Old DuPont was aware that fluorides were detected in the blood of its employees.

112. On or about March 20, 1981, the 3M Company, Old DuPont's then supplier of PFOA, advised Old DuPont about the potential for PFOA to cause birth defects in rats.

113. In 1981, Old DuPont conducted a study of pregnant employees for their exposure to PFOA and monitored umbilical cord blood for PFOA and tested babies' blood, demonstrating the existence of PFOA in umbilical cord blood, showing the movement of PFOA from mother through the placenta to the fetus. According to U.S. EPA, Old DuPont did not submit this information to U.S. EPA as required pursuant to the Toxic Substance Control Act ("TSCA").

114. In 1981, Old DuPont reassigned its WV female workers after animal studies revealed PFAS damage to the eyes of developing fetus.

115. By 1982, Old DuPont was aware that C-8 is bio accumulative and

40

is retained in the blood for a long time" and cautioned its employees about donating blood.

116.    By July 1987, Old DuPont recognized the need to establish maximum safe C-8 in blood and C-8 in drinking water levels and that "once the safe level is established, those personnel exceeding 50% of this level will be required to be removed from the exposure area."

117.    By 1989, through a mortality and cancer surveillance study, Old DuPont was aware of excess kidney and other urinary cancers among its WV Washington Works employees.

118.    Despite this knowledge, Old DuPont continued to discharge PFAS-containing materials into the environment – even though a 1991 internal memo stated that C-8 should not be discharged to surface water.

119.    In 1995, an internal Old DuPont document states: "We are concerned about the potential long-term human health effects of these materials considering they all appear to have long biological half lives."

120.    In a 1997 update to its mortality studies, Old DuPont found heightened cancer rates among workers at its WV Washington Works facility.

2. DEFENDANTS ACTIVELY CONCEALED ADVERSE
INFORMATION AND RESISTED CALLS TO REGULATE AS IT
CONTINUED TO PROFIT

121.   Despite their knowledge of the hazards associated with PFAS,

defendants actively sought to suppress scientific research on the hazards associated

with them and mounted a campaign to control the scientific dialogue on the risks of

PFAS.

122.   The potential loss of their significant business from the sale and

use of PFAS drove defendants to hide the truth.

123.   In internal documents and testimony made public, defendants

evidenced a deliberate, intentional corporate strategy to shape the debate at all levels,

with the company's goal to:

> create the climate and conditions that will obviate, or at the very least,
> minimize ongoing litigation and contemplated regulation related to
> PFOA. This will facilitate the publication of papers and articles
> dispelling the alleged nexus between PFOA and teratogenicity as well as
> other claimed harm.  We would also lay the foundation for creating
> *Daubert* precedent to discourage additional lawsuits...This battle must
> be won in the minds of the regulators, judges, potential jurors, and the
> plaintiff's bar...Manufacturers must be the aggressors.

124.   Despite being aware of the presence of C-8 in public drinking

water supplies near their WV manufacturing facility as early as 1984, defendants

never publicly disclosed the contamination, at least through 1991, even though it had

prepared standby press releases to inform the public.

125.   Even though defendants conducted their own studies regarding the

42

toxicity of C-8, DuPont defendants didn't communicate the results to the public or to environmental regulators.

126. Despite its knowledge to the contrary, Old DuPont had a plan developed to "construct a study to establish that PFOA is safe," in order to illustrate how epidemiological association has little or nothing to do with individual causation.

127. Old DuPont understood that persons exposed to C-8 would be accumulating C-8 in their blood. Internally, its employees expressed concerns that "toxicity issues associated with C-8 exposure could turn it into the #1 DuPont torte [sic] issue."

128. In 2001, defendants' in-house counsel stated in an email: "We have learned that not only do we have people drinking our famous surfactant, but levels in the ambient air above our guidelines… we should have checked this years ago and take [sic] steps to remedy."

129. The same in-house counsel cited above, Mr. Bernard Reilly, also said in 2001: "our analytical technique [for measuring C-8 in water] has very poor recovery, often 25%, so any results we get should be multiplied by a factor of 4 or 5. However, that has not been the practice, so we have been telling the agencies results that surely are low. Not a pretty situation, especially since we have been telling the drinking water folks not to worry, results have been under the level we deem "safe" of 1ppb."

130.    Further Mr. Reilly said: "we are exceeding the levels we say we set as our own guideline, mostly because no one bothered to do the air modeling until now, and our water test has [been] completely inadequate...I have been telling the business to get out all the bad news...Too bad the business wants to hunker down as though everything will not come out in the litigation, god knows how they could be so clueless."

131.    In 2003, despite DuPont's knowledge of the dangers associated with C-8, DuPont defendants adopted a C-8 Communications Plan that would not raise concerns.

132.    Despite their knowledge, in April 2003, defendants reaffirmed their position that there is no evidence indicating adverse human health effects related to low levels of exposure to PFOA. Defendants said they fully supports U.S. EPA's position that EPA "does not believe there is any reason for consumers to stop using any consumer or industrial related products because of concerns about PFOA."

133.    In 2004, defendants were aware of very high levels of C-8 in the blood of community members who drank C-8 contaminated water but defendants did not report that information to the community or to the regulators. According to U.S. EPA, there was also evidence that defendants became aware of levels of C-8 exceeding 1ppb coming out of the tap in homes in the 1980's but did not report those data to U.S. EPA.

134.   Pursuant to TSCA, defendants were required to notify U.S. EPA of any information reasonably indicating that a product presents a substantial risk of injury to health or the environment.

135.   By illegally failing to inform U.S. EPA of the internally known hazards of PFAS for more than 20 years, defendants delayed scientific understanding for decades and turned their back on their corporate responsibility to warn users and the affected public in Pennsylvania and elsewhere of the potential harms that they knew but failed to disclose while continuing to profit from the sale of these chemicals.

136.   Only after a private attorney (Attorney Robert Bilott) provided U.S. EPA with documents showing that defendants had known about the environmental and health harms of PFAS for decades did U.S. EPA find out this information and find out about defendants' unlawful failures to disclosure required information.

137.   In July 2004, U.S. EPA fined Old DuPont *$16.5 million* for its deception and unlawful concealment of relevant information - all in violation of TSCA.

138.   In its enforcement action, U.S. EPA said the violations consisted of multiple failures by defendants to report information to U.S. EPA about substantial risk of injury to human health or the environment from their PFAS chemical used in

manufacturing their fluoropolymers during the period beginning in June, 1981 through March 2001. These failures included failing to provide U.S. EPA with toxicological information regarding PFOA despite an information request for the specific information. This information was critical to U.S. EPA's ongoing priority work to better understand PFOA.

139.  In December 2004, U.S. EPA filed yet another complaint against defendants for withholding additional information - the results of human blood sampling information that demonstrated levels of PFOA in individuals living near their Parkersburg, WV facility. The 12 individuals tested claim to have stopped using the contaminated water as drinking water three years earlier. While the average background levels of PFOAS in individuals is approximately 5 ppb, the levels of PFOA in these individuals ranged from 15.7 ppb to 128 ppb. This information is critical to U.S. EPA's ongoing review of PFOA.

140.  Defendants knew from experiences at their own manufacturing facilities in WV that, if improperly disposed of, PFAS would be a serious contaminant in the environment. Defendants' disposal of PFAS at a number of WV sites demonstrated to them how PFAS continually migrates to the water table. Early on, Old DuPont knew that residents in the vicinity of its WV facility had high levels of PFAS in their drinking water-- presenting Old DuPont with evidence of widespread PFAS contamination emanating from its manufacturing facilities.

46

141.    When defendants developed GenX, they touted it as a safe alternative to other PFAS and as having a more favorable toxicological profile than C-8.   However, while actively publicly promoting GenX as a safe alternative, defendants filed with U.S. EPA 16 reports of "substantial risk of injury to health or the environment" regarding GenX.

142.    Defendants continued to assert that the weight of evidence does not show that their PFAS causes harm to humans.  For example, on April 13, 2003, an Old DuPont representative is quoted in a Wilmington, Delaware newspaper as saying it stands by its C-8, and that is does not harm human beings.  In 2008, Old DuPont literature is quoted in an article in the Industrial Fire World Magazine as stating that Old DuPont believes the weight of the evidence indicates that PFOA exposure does not pose a health risk to the public because there are no human health effects known to be caused by PFOA.

### 3. DEFENDANTS' CAMPAIGN OF DECEPTION:  THE MESSAGE

143.    Instead of using what they were learning to protect consumers across the country and Pennsylvanians from the harmful effects of their products, defendants continued to misrepresent their products' safety, continued to sell the products and continued to profit from these sales.

144.    Despite decades-long knowledge to the contrary, defendants promoted, and defended their PFAS and AFFF containing their PFAS at all relevant

47

times as being safe to use including with typical fire-fighting equipment.

(a) Defendants Failed To Disclose Critical Information Thereby
Creating A Likelihood Of Confusion Or Misunderstanding.

145.   Defendants knew but failed to disclose that their products could

cause the following types of environmental risks:

- The release of PFAS-containing AFFF into the environment
  would lead to the mixing of PFAS with groundwater that would
  migrate great distances;
- PFAS-containing AFFF would persist over long periods of time
  because it was not biodegradable;
- PFAS-containing AFFF released into the environment would
  bioaccumulate in humans and wildlife;
- PFAS-containing AFFF was harmful for aquatic and mammal life.

146.   Defendants never warned Pennsylvania users of their products or

the general public about the risks to the Commonwealth's residents and its public

natural resources.  Defendants also failed to provide users with necessary

precautionary steps to prevent or minimize releases of AFFF into the environment or

with information about how to remediate those releases.

147.   As described above, defendants paid large fines to U.S. EPA for

their unlawful concealment of data indicating the harms of their PFAS.

4. DEFENDANTS THROUGH TRADE ASSOCIATIONS
DECEIVED AND MISLED THE GOVERNMENT AND THE
PUBLIC ABOUT THE NATURE AND EFFECTS OF THEIR PFAS

148.   Defendants were/are members of firefighting trade associations.

48

Through involvement in these various trade associations, defendants provided information and were/are provided knowledge and information regarding PFOS and PFOA and their precursors released from AFFF but did not share that information with the public, customers or the Commonwealth.

149.    These associations and groups, on behalf of the AFFF manufacturers and the manufacturers of PFAS used as components of AFFF products, made great efforts to dispel concerns about the impacts of their members' AFFF - including AFFF manufacturers whose AFFF contained defendants' PFAS - had on the environment and human health. They worked in concert to conceal known risks of AFFF from the government, AFFF customers and the public.

150.    As early as 1970, a national firefighting trade association, the National Fire Protection Association ("NFPA"), was alerted to the toxic effects on fish from a PFAS chemical compound.[31]  Defendants were/are members and actively participated as members of various section executive boards at NFPA. U.S. DOD used its communications with this trade association as a means to communicate with AFFF manufacturers. Thus, through this trade association, defendants, holding themselves out as experts in the fire protection field, had reason to know of these toxic effects of PFAS as early as 1970.

151.    In March 2001, the NFPA had a meeting – attended by a

_____

[31] The NFPA is a global self-funded nonprofit established in 1896.

representative of defendants – concerning 3M's decision to phase out both PFAS

production and Class B Foams. During that meeting, a letter from a U.S. DOD

representative was read, in which U.S. DOD described telomer-based fluorinated

surfactants – used by AFFF manufacturers and made by defendants– as being

persistent and more toxic than the PFAS used by 3M.

152. Another AFFF trade association, the Firefighting Foam Coalition

("FFFC"), was formed in 2001 to advocate for AFFF's continuing viability after 3M

was forced to take its PFAS and AFFF off the market. FFFC states that it is a not-for-

profit whose members are manufacturers, distributors and users of AFFF firefighting

agents and their chemical components.

153. Defendants are members of the FFFC. FFFC regularly published

newsletters promoting AFFF products. The American Chemistry Council ("ACC") is

a lobbying group for the FFFC. One of defendants' executives is on the executive

committee of the ACC.

154. In a September 28, 2001 meeting with key officials at U.S. EPA,

telomer AFFF manufacturers made it clear that the FFFC would "represent the AFFF

industry's interests on issues related to the environmental acceptability of firefighting

foams."

155. The FFFC identified itself as the organization that would provide

"a focal point for industry science reviews, development of industry positions, and

interactions with the EPA and other relevant organizations." The FFFC announced

that it would serve as "a single source for accurate, balanced information on

environment related questions" and would ensure that accurate information about

PFOS alternatives, including telomer-based products, is disseminated in the

marketplace.

156.    The FFFC on behalf of its members repeated the message that

only one PFAS had been taken off the market – 3M's PFOS – and because FFFC

members' products did not contain 3M's PFOS, their products were still on the

market – suggesting their PFAS products were safe compared to 3M's.  FCCC

disseminated this message to its members.

157.    In one such publication from May 2002, FFFC stated:

> It's important to remember that 3M is the only manufacturer that has
> stopped production of its aqueous film-forming foam (AFFF) fire
> fighting agents.  This is because the AFFF produced by 3M contains
> PFOS, a chemical the government considers to have both environmental
> and toxicological concerns.  Other AFFF manufacturers, such as Kidde,
> Ansul and Buckeye, whose products do not contain PFOS, will continue
> to produce AFFF for both Commercial and military applications.

158.    This claim implied that, since its members' AFFFs did not contain

3M's PFOS, the members' products were safe "PFOS alternatives," – a message that

was misleading and confusing.

159.    In its effort to distinguish telomer-based AFFF from 3M's AFFF,

the FFFC stated that "telomer-based AFFF does not contain PFOS and cannot be

oxidized or metabolized into PFOS." Notably, PFOS was only manufactured by 3M.

160.    This entire time, the FFFC and defendants knew that their AFFF product contained PFOA or PFOA precursors and that PFOA was also very persistent, bio-accumulating and toxic.

161.    U.S. EPA was struggling at this time to understand the properties and effects of telomer-based AFFF as it had the same knowledge gap that previously existed with regards to 3M's AFFF. Due in large part to the misleading confusion created by messaging of the FFFC and defendants, U.S. EPA delayed until 2006 putting into place a program to reduce PFOA from entering the environment.[32]

162.    Even more boldly, in a 2003 presentation, a FFFC representative deceptively told U.S. EPA that "telomer-based fire-fighting foams are not likely to be a source of PFOA in the environment" and then stated that "everyone in the room including EPA agreed." FFFC made that representation while knowing that the PFAS in the telomer AFFF products were PFOA precursors and break down into PFOA.

### D.   OLD DUPONT'S FRAUDULENT SCHEME TO ISOLATE ITS VALUABLE ASSETS FROM ITS PFAS LIABILITIES

163.    As its financial problems associated with PFAS were mounting,

---

[32] See EPA presentation to US DOD entitled "EPA Activities/Issues on Fluorosurfactants" March 16, 2001; See also EPA's PFOA stewardship program available at https://www.epa.gov/assessing-and-managing-chemicals-under-tsca/fact-sheet-20102015-pfoa-stewardship-program.

Old DuPont began a series of complex transactions that transformed the company's structure and attempted to shift responsibility for environmental obligations associated with the chemicals onto other entities.

164.    Included with a series of convoluted reorganizations and spinoffs implemented sometime in 2013 was the creation of The Chemours Company, a wholly-owned subsidiary. Old DuPont then transferred its "Performance Chemicals" operations (including products that required the use of PFOA and other PFAS), businesses that carried huge environmental cleanup and regulatory enforcement and compliance encumbrances. According to SEC filings in 2015, there was concern that these obligations could become a more than $1 billion burden.

165.    As the parent company, Old DuPont had exclusive control over Chemours' management team and its day-to-day operations including the selection of Chemours' Board of Directors. Initially, the Chemours board consisted of four members: a former member of Old DuPont's Board of Directors and three DuPont employees.

166.    Just before the spinoff and the signing of the Separation Agreement, the Board of Directors changed, increasing to eight members. The three DuPont employees resigned and seven new members were designated to fill the vacancies and newly added seats. That left only one of the original four - the Old DuPont Board member. Significantly, as the parent company, Old DuPont was

legally able to act solely on behalf of itself and its stockholders. It was also permitted to determine whether the new slate of Chemours board members would be allowed to participate in the negotiations of the Separation Agreement on behalf of Chemours. Old DuPont decided not to allow the new board to engage in the discussions, leaving Chemours unprotected from Old DuPont's decisions regarding Chemours' fate.

167.   The details of the Separation Agreement between the two companies as well as many other aspects of the series of transactions initiated by Old DuPont at the time of the Chemours spinoff, are hidden from the public in confidential schedules and exhibits to the various restructuring agreements, making it difficult for creditors who were seeking compensation with respect to these arrangements. The Commonwealth of Pennsylvania is among those creditors.

168.   To effectuate the agreement, Chemours transferred approximately $4 billion, part of which included $507 million from the issuance of promissory notes. Additionally, Chemours issued approximately $3 billion in common stock to Old DuPont shareholders as a dividend on July 1, 2015. Old DuPont's shareholders owned the company initially, but as they sold their shares, Chemours stock plunged.

169.   Another provision of the Separation Agreement required Chemours to assume financial responsibility and indemnify Old DuPont for any PFAS related claims up to a certified maximum of $1.42 billion.

170.   Old DuPont hired a highly regarded worldwide financial advisory

firm to provide an opinion regarding Chemours' solvency on the spinoff date. The

analysis completed by the company determined that Chemours would be solvent,

However, that opinion was based on the "high end (maximum) realistic exposure"

estimates for dozens of sites and problems …where DuPont had 'engineered to

massively understate the real burden.'

171.    In a lawsuit filed by Chemours in 2019, it claimed that the

"central, substantive issue in this case is whether the certified maximum liability

estimate in connection with the spinoff operated in any wa[y] [] as a cap on

Chemours' inherited liability."

172.    Examples of Old DuPont's extreme underestimation of liabilities

includes the estimation for the maximum liability for 3,500 cancer and other claims

related to a type of PFAS in 2015 of $128 million. Two years later Old DuPont

agreed to settle the case for $671 million. And in a PFAS case in North Carolina,

Old DuPont estimated the exposure for Chemours at $2.09 million but in its suit

against Old DuPont, NC alleges that it will be over $200 million.

173.    The draconian provisions of the Separation Agreement required

Chemours to indemnify Old DuPont and assume its liabilities regardless of: (1) when

or where the liabilities arose; (2) whether the facts upon which they are based

occurred prior to, on, or subsequent to the effective date of the spinoff; (3) where or

against whom such liabilities are asserted or determined; (4) whether arising from or

55

alleged to arise from negligence, gross negligence, recklessness, violation of law, fraud or misrepresentation by any member of the Old DuPont or Chemours group; (5) the accuracy of the maximum probable loss values assigned to such liabilities; and (6) which entity is named in any action associated with any liability. Put simply, the Agreement forced Chemours to accept responsibility for all environmental liabilities regardless of how and when they arose and; who was at fault, and even if Old DuPont had committed fraud or violated the law. Chemours was also required to indemnify Old DuPont and assume liability for any of the performance chemical business that Old DuPont had transferred prior to the spinoff including benzene, another environmentally damaging chemical.

174. At the end of December 2014, months before the spinoff, Chemours reported total assets of $5.959 billion and total liabilities of $2.286 billion. Following the Chemours spinoff, it had total assets of $6.298 billion and its liabilities had skyrocketed to $6.168 billion leaving a new worth of $130 million.

175. Chemours, with primary responsibility for the estimated tens of billions of dollars in PFAS obligations, does not have anywhere near the money or assets to cover them. Chemours' net worth — its assets minus liabilities — stood at just $695 million as of Dec. 31, 2019.

176. These terms, inflicted on Chemours one-sidedly by Old DuPont, drove Chemours to file a lawsuit against Old DuPont in 2019. Chemours, deep in

debt, sued DuPont claiming that the spinoff was conceived to get Old DuPont off the hook for the contamination resulting from the forever chemicals by downplaying the extent of its PFAS liability.

177.    Chemours further alleged that it had been powerless to negotiate any of the provisions of the Separation Agreement, that it did not have its own unbiased board of directors to protect its interests, or its own management or counsel to assess the fairness of the deal because all of the legal documents were drawn up by Old DuPont's own counsel without any consideration for Chemours.

178.    Merger experts say that potential shareholders will take on undervalued liabilities in spinoffs because the kind of in-depth due diligence that a third-party buyer would do to determine potential liabilities is not typically done by new owners in a spinoff, and instead buyers rely on the parent company to be transparent regarding financial liabilities. Had Old DuPont sold this business to another company, the buyer would have investigated the financial obligations of the company it intended to purchase to determine the potential liabilities and, if any were found, used that to negotiate a lower sale price.

179.    Back in 2015, when Old DuPont was preparing to spin off Chemours, the Securities and Exchange Commission found Old DuPont made insufficient disclosures about the environmental liabilities that Chemours' shareholders were about to take on. The company had to provide more details,

57

regulatory filings show.

180.    And, Chemours' 2015 filings estimated its environmental remedial cleanup obligations — excluding human health problems — at $295 million. But citing "considerable uncertainty" regarding those costs, Chemours filings said that "adverse changes in circumstances" could bring the total to just over $1 billion.

181.    In 2017, the next big step in Old DuPont's reorganization became final in an all stock "merger of equals" between Dow Chemical Company and Old DuPont. The merger was planned years earlier as part of the plan conceived by Old DuPont in its efforts to avoid liability before the Chemours spinoff. The result was a holding company consisting of Old DuPont and Old Dow as sister companies. The newly organized company became DowDuPont. Old DuPont transferred its business and product lines to DowDuPont.

182.    DowDuPont then underwent significant internal reorganization and executed numerous business segment and product line realignments and divestitures resulting in three separate divisions forming three different companies: Corteva Agriscience was responsible for the Agriculture Business to be run by Corteva Inc.; the Materials Science Business to be run by New Dow; and the Specialty Products Business (and some additional non-core businesses) to be run by Old DuPont - which during the transition, changed its name to E.I. DuPont de Nemours & Company.

183.    Each of these three separate corporate entities retained the liabilities related to the business divisions for which they were responsible. Information about what assets and liabilities were transferred among these corporate entities has not been disclosed.

184.    Corteva assumed some of the direct financial liabilities of Old DuPont. E.I DuPont de Nemours also assumed some of the liabilities the company held prior to the merger.

185.    In 2020, the Delaware court dismissed Chemours 2019 lawsuit against Old DuPont on jurisdictional grounds. Months later, in January 2021, DuPont, Chemours and Corteva agreed to split the costs of future ligation and cleanup costs related to PFAS pollution that occurred before 2015.

E. USE OF PFAS-CONTAINING AFFF IN PENNSYLVANIA

186.    Defendants' PFAS and/or PFAS-containing AFFF products have been stored and/or used for decades throughout Pennsylvania at airports, industrial facilities, military facilities, firefighting training centers, and sites of fires.

187.    As described above, with each such intended use, PFAS-containing AFFF enters Pennsylvania's water cycle through residual soil impacts, runoff and groundwater infiltration. PFAS-containing AFFF products were thus discharged into the environment at or from sites throughout Pennsylvania resulting in contamination of public and private drinking water wells, groundwater, surface

waters, sediments and biota. The spread of the contamination continues as AFFF continues to migrate.

188.    Pennsylvania users of AFFF stockpiled it for future use in warehouses, as the product was advertised as having a long shelf life. Even as defendants knew of the harms that PFAS-containing AFFF could cause, they did not recall their PFAS or AFFF products from Pennsylvania sites. Defendants did not instruct or warn their Pennsylvania customers that they should discontinue use of PFAS-containing AFFF or how to properly dispose of AFFF.

### 1. U.S. DOD USE OF PFAS-CONTAINING AFFF

189.    U.S. DOD started using PFAS-containing AFFF beginning in the late 1960s.

190.    On July 24, 2021, U.S. DOD made public a description of its procurement process and a list of vendors. AFFF manufacturers provided AFFF to the military and are on its Qualified Products List. These manufacturers sold directly to U.S. DOD. Defendants sold their PFAS to AFFF manufacturers which was then used in the AFFF products sold to the U.S. DOD.

191.    After U.S. DOD purchases AFFF, the product enters the military supply system and is no longer tracked by manufacturer or product name. All the products must meet the military specifications and are thus standardized, interchangeable products which U.S. DOD can and does mix together. U.S. DOD's

logistics centers then ship the mixed PFAS-containing AFFF to military facilities

around the country, including to numerous sites in Pennsylvania

192.    From approximately 1967 through the mid-1990s, U.S. DOD

purchased AFFF almost exclusively from 3M;[33] however, during this period, U.S.

DOD also purchased AFFF from others when 3M was unable to fulfill an order.

193.    After 3M left the business, defendants and other PFAS and AFFF

manufacturers stepped up and began selling more AFFF to U.S. DOD.

194.    Decades-long use of PFAS-containing AFFF led to significant

releases of these chemicals at military facilities across Pennsylvania.[34]  As described

more specifically below, major PFAS contamination from AFFF has been identified

at and around various U.S. DOD sites in Pennsylvania, including the Willow Grove

Military Facilities. As the investigation continues, it is expected that additional

contamination will be uncovered.

### 2. OTHER USES OF PFAS-CONTAINING AFFF

195.    In addition to U.S. DOD facilities located in Pennsylvania, PFAS-

containing AFFF which was manufactured using defendants' PFAS was and

continues to be used at all 14 commercial service airports throughout Pennsylvania,

---

[33] Although phased out of production by 2002, 3M's legacy PFOS-containing AFFFs are considered the dominant source of PFAS at AFFF-impacted sites. https://pfas-1.itrcweb.org/3-firefighting-foams/#3_3.

[34] *See* June 22, 2021 U.S. Government Accountability Office ("GAO") Report, at its website: https://www.gao.gov/products/gao-21-421.

including but not limited to the Philadelphia International Airport, the Pittsburgh International Airport, the Williamsport Regional Airport, the Wilkes-Barre Scranton International Airport, the University Park Airport, the Reading Regional Airport, the Lancaster County Airport, the Harrisburg International Airport, and the Johnstown Cambria County Airport. For example, these AFFF were used at, without limitation, the Arnold Palmer Airport, Bradford Regional Airport, Erie International Airport, Johnstown Cambria County Airport, and Lehigh Valley International Airport and was used to put out fires at other locations across the Commonwealth.

196. Upon information and belief, at least one manufacturer's AFFF using defendants' PFAS was used in the Commonwealth to train firefighters, and was also used by others throughout the Commonwealth. At least one AFFF manufacturer that used defendants' PFAS sells AFFF to a wide range of sectors including oil and petrochemical companies, power stations, harbors and ports, and local municipal fire and rescue services.

197. In March 2022, data released by U.S. EPA shows that there were spills or uses of PFAS-containing AFFF across Pennsylvania. The data shows that since 1990, there have been at least 27 AFFF spills throughout Pennsylvania.

198. Among those most directly and adversely affected by the use of AFFF in the Commonwealth include the Commonwealth, its servicemen and service women, and citizens who live or work at or near the military facilities and other sites

where AFFF was and is used, firefighters, county firefighting training academies,

local fire departments and Commonwealth airports.

## F.  AFFF-CONTAMINATED SITES IN PENNSYLVANIA

199.    The quality of the Commonwealth's water resources, sediments,

fish, soil and wildlife directly and significantly affects the quality of life of

Commonwealth residents.

200.    Defendants' manufacturing, distributing and/or selling of PFAS

incorporated into AFFF products used in the Commonwealth have been substantial

factors in causing the release of PFAS chemicals into Pennsylvania's natural

resources from the use of defendants' products as intended in Pennsylvania.

201.    Levels of PFAS-containing AFFF contamination in Pennsylvania

are among the highest of any found in the United States.  A 2013-2014 study found

that Pennsylvania is one of 13 states accounting for three-quarters of all detections of

PFAS chemicals in the environment.[35]

202.    PFAS attributable to AFFF has been found widespread in the

Commonwealth's drinking water, groundwater, surface water, sediments, soils, biota

and other natural resources located near where AFFF was transported, stored, used,

---

[35] Hu, X. D. C.; Andrews, D. Q.; Lindstrom, A. B.; Bruton, T. A.; Schaider, L. A.; Grandjean, P.; Lohmann, R.; Carignan, C. C.; Blum, A.; Balan, S. A.; Higgins, C. P.; Sunderland, E. M., Detection of poly- and perfluoroalkyl substances (PFASs) in US drinking water linked to industrial sites, military fire training areas, and wastewater treatment plants. *Environ. Sci. Technol. Lett.* 2016, 3 (10), 344-350.

handled, released, spilled and/or disposed of.

203.    PFAS attributed to AFFF remains in the groundwater and surface waters in Pennsylvania and continues to flow.

204.    The Commonwealth has spent significant time, effort, and money in a variety of efforts to assess, investigate and implement strategies designed to address PFAS contamination of the Commonwealth's public natural resources. The Commonwealth's investigations and responses are ongoing, and as the investigation continues, additional locations are being identified and contamination delineated. It is expected that significant further PFAS contamination from defendants' AFFF products will be uncovered. The following sites illustrate the variety and breadth of the contamination PFAS-containing AFFF products have caused in the Commonwealth as known presently.

1. U.S. DOD SITES

205.    A recent study noted that each additional U.S. DOD military site in a given watershed is associated with a 35 percent higher PFAS concentration in the water of the watershed.[36] Another study noted that higher PFAS levels in water can lead to blood serum PFAS concentrations well above the 95th percentile levels in the

_____

[36]*Id.*

64

populations.[37]  Pennsylvania is home to many military facilities.

(a) Willow Grove Military Facilities

206.    The communities surrounding the Willow Grove Military

Facilities discovered in 2014 that the water they had been consuming – in which they

bathed, cooked their food and washed their belongings – has been increasingly

contaminated by PFAS.

207.    It is likely that the communities near the Willow Grove Military

Facilities had been exposed to PFAS in their drinking water at levels substantially

above U.S. EPA's 2022 HALs for *nearly 50 years*.[38]

208.    PFAS attributable to AFFF has been found in the

Commonwealth's drinking water, groundwater, surface water, sediments, soils, biota

and other natural resources located at or near where AFFF was transported, stored,

used, handled, released, spilled and/or disposed at the Willow Grove Military

Facilities.[39]

---

[37] Post, G. B.; Gleason, J. A.; Cooper, K. R., Key scientific issues in developing drinking water guidelines for perfluoroalkyl acids: Contaminants of emerging concern. *PLoS. Biol*. 2017, 15 (12), 12.

[38] *See* PA DOH/ ATSDR, PFAS Exposure Assessment Final Report, April 2019, located on the ATSDR's website at: https://www.atsdr.cdc.gov/pfas/docs/PFAS-EA-Final-Report-508.pdf.

[39]*See* the ATSDR's letter health consultation that evaluated the available off-site water test results. ATSDR CDC Letter Health Consultation, March 13, 2020 at https://www.atsdr.cdc.gov/HAC/pha/willowgrove/Willow_Grove_Naval_Air_and_Air_Reserve_L HC-508.pdf . *See* also https://www.atsdr.cdc.gov/HAC/pha/NavalAirWarfareCenter/Naval_Air_Warfare_Center_LHC_01

209.    The PFAS contamination at and around the Willow Grove
Military Facilities is among the worst PFAS contamination in the U.S. AFFF-related
PFAS compounds were detected in drinking water supply wells at and near the
Willow Grove Military Facilities and the communities that surround them at very
high levels – some of the highest levels of PFAS contamination in groundwater at
any US military installation. In 2019, the PFAS levels at the Horsham Air Guard
Station (aka Biddle Air National Guard Base) were found to be 300,000 ppt– more
than 4,000 times higher than the now superseded 2016 U.S. EPA's HAL of 70 ppt
and even more times higher than the 2022 U.S. EPA HALs for PFOA and PFOS.[40]

210.    In 2014 and 2015, U.S. EPA issued two administrative
enforcement orders at the Willow Grove Military facilities, finding that the PFAS
contamination presented "imminent and substantial endangerment" pursuant to
Section 300i of the federal Safe Drinking Water Act.

211.    The Commonwealth and these communities continue to
experience grave concerns because of the potential adverse health effects from this

---

-20-2016_508.pdfpdf icon and Executive Summary: Public Health Evaluation of PFAS in Drinking
Water.pdf icon.
[40]*See* https://www.ewg.org/interactive-maps/pfas_contamination/map/ providing U.S. DOD PFAS
sampling test results of PFOS concentrations of 300,000 ppt, PFOS and PFOA combined
concentrations of 309,700 ppt. For complete Navy Air Station PFAS sampling results for the Naval
facilities in and around Willow Grove, *see* FOIA response document at
https://www.secnav.navy.mil/foia/readingroom/SitePages/Home.aspx?RootFolder=%2Ffoia%2Frea
dingroom%2FHotTopics%2FPFAS%2FEWG%20FOIA%20Request%2FDrinking%20Water%2F
Willow%20Grove&FolderCTID=0x012000C9F89F68DF40E744A067873ECF6220C0&View=%7
B854CB8F6%2D5C90%2D46E6%2DA4A1%2D11FD0F9B23C6%7D.

66

exposure.

212.    U.S. DOD 2018 PFAS test results of samples taken off-base at the

Warminster Naval Air Warfare Center in Warminster are as follows:[41]

| PFAS | Location detected | Maximum level (ppt) and year tested |
|---|---|---|
| PFOS + PFOA | Drinking water Off-base | 22,400 2018 |
| PFOS | Drinking water Off-base | 7,400 2018 |
| PFOA | Drinking water Off-base | 15,000 2018 |
| PFBS | Drinking water Off-base | 4,000 2018 |
| PFHxS | Drinking water Off-base | 730 2018 |

213.    U.S. DOD PFAS test results of samples taken on-base at the

Horsham Air Guard Station in Montgomery County are as follows:[42]

| PFAS | Location Detected | Maximum level (ppt) Years tested |
|---|---|---|
| PFBS | Groundwater On-base | 15,000 2019 |
| PFHpA | Groundwater On-base | 3,000 2019 |

[41] https://www.ewg.org/interactive-maps/pfas_contamination/map/.  *See* also at page 4 of 4 of DOD data, FY18 HASC Brief on PFOS-PFOA.
[42] https://www.ewg.org/interactive-maps/pfas_contamination/map/

67

| PFHxS | Groundwater On-base | 61,000 2019 |
|---|---|---|
| PFNA | Groundwater On-base | 68 2019 |
| PFOA | Groundwater On-base | 9,700 2019 |
| PFOS | Groundwater On-base | 300,000 2019 |
| PFOS+PFOA | Groundwater On-base | 309,700 2019 |

214.    Horsham Water & Sewer Authority, which serves a population of

25,000 Pennsylvanians off-base adjacent to Willow Grove Military Facilities,

reported the following PFAS test results: [43]

| PFAS | Years tested | Maximum levels(ppt) |
|---|---|---|
| PFBS | 2014 | 110 |
| PFHxS | 2014 | 590 |
| PFOS | 2014-2019 | 2,615 |
| PFOA | 2014-2019 | 655 |
| Total PFAS | 2014-2019 | 2,615 |

---

[43] https://www.horshamwater-sewer.com/sites/default/files/ccr_reports/2017_ccr.pdf; Available at
https://www.ewg.org/interactive-maps/pfas_contamination/map/

215.    Warrington Township Water and Sewer Department which serves
18,400 Pennsylvanians off-base adjacent to Willow Grove Military Facilities reported
the following PFAS test results:[44]

| PFAS | Years Tested | Maximum Level (ppt) |
|------|--------------|---------------------|
| PFHxS | 2014-2015 | 244 |
| PFOS | 2014-2015 | 667 |
| PFOA | 2014-2015 | 118 |
| Total PFAS | 2014-2015 | 667 |

216.    PFAS were detected in 93 out of the 100 private wells within a
one- to three-mile radius of these facilities, potentially impacting thousands of users
of private drinking water wells.[45] Approximately 46,000 users of public water
supplies in Horsham and Warrington were affected by PFAS in their drinking water.
PFAS compounds were found in blood samples of a statistically representative cohort
of local citizens – all at levels exceeding the national average, and the blood PFAS

---

[44] https://www.ewg.org/tapwater/system.php?pws=PA1090070
[45] The combined total number of citizens impacted has been estimated to be more than 70,000.
Bagenstose, Kyle, December 12, 2018, //www.ellwoodcityledger.com/news/20181212/frustrations-
continue-at-military-meeting-on-pfas-cleanup.

levels increased with length of residence in the area.[46]

217.    The Willow Grove Military Facilities are part of a federal cleanup effort and are listed on the National Priority List ("NPL"), commonly referred to as the Superfund list, promulgated under CERCLA. U.S. DOD is still in the midst of a remedial investigation to "study" the PFAS contamination in Bucks and Montgomery counties. U.S. DOD states that, while it is conducting its remedial investigation, it is only implementing limited measures to address "imminent and substantial dangers" posed to public human health caused by drinking water exposure, including soil removal and a pilot pump-and-treat system for groundwater at Willow Grove.

218.    Pennsylvanians who live near the Willow Grove Military Facilities are in the path of those "imminent and substantial" dangers to public health and are exposed to these extremely high levels of PFAS-contaminated drinking water.

219.    U.S. DOD provided bottled water to some of these families for months while connecting the families to the public water supply. Some of the contaminated drinking water wells had such high levels of PFAS that the wells were closed and eventually taken off-line.

220.    In June 2021, Navy officials stated that a pilot pump-and-treat

---

[46]Pennsylvania Department of Health's statistically representative blood monitoring of community members revealed that PFOS was detected in all 235 monitored participants.

system has been installed at the facility to extract contaminated groundwater, treat it with activated carbon and ion exchange resins and then discharge to a storm drain. The Navy has also excavated approximately 4,000 tons of contaminated soil and disposed of it at a landfill.[47]

221.    The local citizens, townships and their water systems have taken on enormous costs and effort to address the contamination.

222.    Additional Commonwealth expenditures are ongoing toward providing clean drinking water for residents impacted by the Willow Grove Military Facilities.

223.    The Willow Grove facility at the Horsham Air Guard Station currently discharges PFAS-laden storm water to unnamed tributaries of Neshaminy Creek, which is a tributary to the Delaware River. Several public water system intakes are located downstream of and down gradient of the Horsham facility.[48] Sampling results show PFAS in the down gradient raw surface water supplies, at levels requiring the public water system to install treatment.[49] On March 24, 2021, PA DEP issued a National Pollutant Discharge Elimination System ("NPDES")

---

[47] *See* GAO report, cited above, at its website: https://www.gao.gov/assets/gao-21-421.pdf
[48] These public water systems include but are not limited to Aqua PA's Main, Hatboro, Bensalem and Bristol systems.
[49] *See* USGS –PA DEP test results from surface water sampling, published March 12 2021; at the USGS website at: Data Set 1. https://www.usgs.gov/news/usgs-releases-first-its-kind-survey-pfas-pennsylvania-surface-waters.

Permit (Permit No. PA0245046) to the Horsham Air Guard Station which established

discharge limits for PFAS.[50]  As discussed in greater detail below, the

Commonwealth issued fish advisories for Neshaminy Creek.

### (b) Other DOD Sites

224.    There are numerous other U.S. DOD facilities in Pennsylvania

where the use of AFFF has led to PFAS contamination, impacting the base and the

surrounding off-base area.

225.    PFAS concentrations in Pennsylvania watersheds where a U.S.

DOD facility is located are cited in various U.S. National Guard reports.  For

example, one such report contains a description of maintenance personnel at the

Pittsburgh Air National Guard Base accidentally spraying water onto a fire panel,

causing it to short circuit and release AFFF. More than 30 minutes later, engineers

came to shut off those valves. The AFFF drained into the storm drain.  Three hours

later, foam was seen on the surface of McClarens Run, a surface water stream at least

a mile away. On another occasion, also at the Pittsburgh facility, the U.S. National

Guard reported that security personnel noticed AFFF pouring out of the front doors

of an airplane hangar and found 2 to 3 feet of AFFF built up in the hangar - 900

gallons of AFFF mixed with 65,000 gallons of water.  Approximately half of that

---

[50] The Horsham Air Guard Station appealed this permit to the PA Environmental Hearing Board;
the appeal has now been settled.

drained into the Moon Township Municipal Authority sewer system at a rate of 100 gallons per hour.[51]

226.    Release of PFAS at these facilities has been occurring for decades.  Firefighting foams are released into the environmental during training, fire events or inadvertently in accidental spills such as those described above.

227.    These sites include but are not limited to the following where U.S. DOD continues to assess PFAS-containing AFFF  use and releases:

- the Department of the Army facilities at:

  - Letterkenny Army Depot in Chambersburg, PA  where on-base groundwater concentrations of  PFOA and PFOS were as high as 2,069 ppt; [52]

  - North Penn Army Reserve site in Worcester, PA where off-site drinking water concentrations of  PFOS and PFOA were as high as 183 ppt and groundwater concentrations were as high as 33,000 ppt for PFOS and 270 ppt for PFOA;[53]

  - Carlisle Barracks in Carlisle PA where total PFAS was detected

---

[51] *See* article interviewing fire fighters from Pittsburgh airport on how they used AFFF at the following website:  https://www.publicsource.org/former-airport-firefighters-pfas-foam-practices/
[52] Six of DOD's test results of samples taken from here were above the 2016 EPA's HAL The DOD only reported results that were above the 2016 U.S. EPA HAL.
[53] https://aec.army.mil/index.php/PFAS/PA/NP Five of the DOD's test results from samples taken here were above the U.S. EPA's then in effect HAL.

at 37.20 ppt.[54]

- the Navy sites at:

  - Mechanicsburg Naval Depot where concentrations of PFAS in drinking water ranged from 3,000,000 ppt to 33,700,000 ppt.[55] Additional 2019 results for 58 off-base drinking water samples found levels of PFOA/PFOS ranging from 0.58 – 50.7 ppt; additional 2022 results for five off-base drinking water samples found levels of PFOA/PFOS ranging from 2.09 to 33.2 ppt ;[56]

  - Former Philadelphia Naval Station, located near the confluence of the Schuylkill and Delaware Rivers, where firefighting training activities occurred regularly from 1944 through September 1995. All groundwater samples contained concentrations of PFOA, PFOS and PFBS above screening levels. Land use controls were put in place to prevent use of

---

[54] https://www.ewg.org/sites/default/files/u352/EWG_PFASTable-Army_C01.pdf?_ga=2.196652588.1607843149.1624826923-349010502.1623426287

[55] PFAS was detected in 59 samples analyzed for PFOA and/or PFOS. *See also* detailed report from DOD included at the following website: https://www.ewg.org/interactive-maps/pfas_contamination/map/. For further information, *see* the Navy's information at: https://www.navfac.navy.mil/products_and_services/ev/products_and_services/env_restoration/installation_map/navfac_atlantic/midlant/mechanicsburg/mechanicsburg_pfas.html

[56] https://www.navfac.navy.mil/Business-Lines/Environmental/Products-and-Services/Environmental-Restoration/Mid-Atlantic/Mechanicsburg-NSA/PFAS-Sampling/

waters for drinking.[57]

- the Air Force sites at:

    - Harrisburg International Airport where on-base groundwater concentrations of various PFAS ranged from 92 ppt to 4,000 ppt of PFAS;[58]

    - Pittsburgh Air Reserve Station and Pittsburgh Air National Guard Base where on-base groundwater concentrations of PFAS ranged from 119 ppt to 6,073 ppt. [59]

### 2. OTHER AFFF CONTAMINATION SITES IN PENNSYLVANIA

228.    In addition to U.S. DOD sites, the Commonwealth has undertaken, conducted and/or overseen sampling and other activities at other sites contaminated by AFFF.

### (a) Airports

229.    The Federal Aviation Administration ("FAA") regulations require all of Pennsylvania's 15 commercial airports to maintain aircraft rescue and fire

---

[57] https://administrative-records.navfac.navy.mil/Public_Documents/MID_ATLANTIC/PHILADELPHIA_NS/N61189_000 553.pdf .
[58] https://www.ewg.org/interactive-maps/pfas_contamination/map.
[59] http://afcec.publicadmin-record.us.af.mil/Search.aspx; *See also* https://www.ewg.org/interactive-maps/pfas_contamination/map/.

fighting vehicles and varying volumes of AFFF on site.[60]  The FAA required that AFFF must meet the MIL-spec developed by the U.S. DOD – which has for decades contained PFAS.[61]  Commercial airports in Pennsylvania have used and/or stored defendants' PFAS-containing AFFF for decades.

230.    In addition, FAA requires that Aircraft Rescue Fire Fighting equipment be tested twice per year. Upon information and belief, in conducting these required FAA tests, airports located throughout Pennsylvania discharged AFFF to the ground.

231.    Past firefighter training exercises at airports and military installations employed large quantities of foam/foam solutions.  Upon information and belief, airports located throughout Pennsylvania have conducted firefighting training exercises resulting in the discharge of defendants' PFAS to the ground.

232.    For example, the Penn State University Airport for years prior to 2006 (and at least one year since then) discharged AFFF to the ground in at least two grass area locations; after those years, the AFFF was discharged to a deicing pad. Groundwater samples were collected in 2019 and 2020 from multiple wells at the airport and in the areas around the airport and were found to contain concentrations of PFAS.  A 2021 PA DEP report found that discharge of AFFF to the ground

---

[60] *See* F.A.A. regulations at 14 C.F.R. Part 139.
[61] *Id.*

surfaces at the Airport during several years of training exercises was highly likely to have contaminated groundwater with PFAS via surface runoff and leaching of the contaminants through soil to groundwater.

233.    As another example, the Susquehanna Area Regional Airport Authority (the owners of the Harrisburg International Airport) found PFOS above the 2016 EPA HAL in several drinking water wells which were then shut down.

234.    Further, in addition to the FAA required trainings and testing, airports across the Commonwealth have reported the discharge of PFAS-containing AFFF at various accidental spill events, emergency events and other non-emergency events. These discharges resulted in PFAS-containing AFFF contamination of the areas' soils, surface water, groundwater and drinking water.

235.    The Commonwealth continues to investigate PFAS-containing AFFF contamination at and around airports in the Commonwealth.

(b) Surface Waters and Fish

236.    The Commonwealth has a duty to protect the public health, welfare, and well-being of Commonwealth residents and to ensure that the Commonwealth's environment and economy are not impaired. Pennsylvania subsistence and recreational anglers interested in collecting and consuming fish from the Commonwealth's waterbodies, and the related economy, have been adversely

affected by fish consumption advisories resulting from PFAS contamination.

237.    The Commonwealth has spent significant time, effort and money in a variety of efforts to assess, investigate and implement strategies designed to reduce or eliminate PFAS contamination of Pennsylvania waters.

238.    As described below in regard to the Commonwealth's response to the PFAS threat, in 2019, the U.S. Geologic Survey ("USGS") and PA DEP together conducted surface water sampling across the Commonwealth from rivers and streams and Lake Erie sites for an array of PFAS, demonstrating levels significantly above the 2022 EPA HALs.  Total PFAS concentrations in individual samples ranged were as high as 113 ng/L.[62] See the following map from that study.



239.    The PA DEP also conducted fish tissue sampling, with results

---

[62] *See* the USGS/PA DEP test results at:
https://www.sciencebase.gov/catalog/item/5e4d5e72e4b0ff554f6d146b; dataset 1_PA_PFAS_Stream_lake_discrete_201909_wide_simple.

demonstrating high levels of PFAS in Commonwealth surface waters and in its fish as shown in the below chart.

| Contaminant | Nanogram/gram | Year | Location | Species |
|---|---|---|---|---|
| PFOS | 325 | 2013 | Neshaminy Creek | American Eel |
| PFOS | 367 | 2014 | Neshaminy Creek | Rock Bass |
| PFOS | 1010 | 2015-11 | Little Neshaminy Creek | Carp |
| PFOS | 2300 | 2015-11 | Little Neshaminy Creek | Small mouth bass |
| PFOS | 935 | 2015-11 | Little Neshaminy Creek | Rock bass |

240.   As a result of these extremely high levels of PFOS found in the creeks, PA DEP, PA Department of Agriculture, and PA DOH along with the PA Fish and Boat Commission announced a "DO NOT EAT" advisory for all fish species caught in the Neshaminy Creek basin in Bucks and Montgomery counties,

79

including two state parks. [63]



64

241.    Sections of the Little Neshaminy Creek and Neshaminy Creek run

near the Willow Grove Military Facilities; Little Neshaminy Creek downstream areas

recharge a drinking water aquifer.

242.    PFAS do not only adversely impact fish in the Commonwealth.

PFAS in fish are taken up by other animals that consume fish as food, posing a threat

to aquatic and other wildlife higher up the food chain, including waterfowl and a host

of fish-eating species.

---

[63] *See* PA DEP website for advisory:
https://www.dep.pa.gov/About/Regional/SoutheastRegion/Community%20Information/Pages/Neshaminy-Creek-Fish-Advisory.aspx
[64] *Id.*

243.    Research revealed the existence and adverse impact of PFAS contamination in other wildlife species resident in the Commonwealth.[65]

244.    PFAS contamination of fish and other wildlife adversely affect not only the health of such animals, but the Commonwealth's residents' ability to enjoy their consumption and recreational opportunities available within the Commonwealth.  In short, contamination of the Commonwealth's waterbodies attributable to defendants' AFFF curtails the ability of Pennsylvanians to collect and consume fish and enjoy recreation at or near any impacted waterbody, to the detriment of Pennsylvania's public and the Commonwealth itself.

(c) Drinking Water Systems

245.    In addition to the U.S. DOD sampling data taken from public water systems, PA DEP has also conducted PFAS sampling of public water systems statewide from 2019 to 2021.

246.    The test results of PA DEP's PFAS sampling showed numerous water systems with results above the 2022 EPA HALs.

247.    Public water systems also conducted their own sampling for PFAS, documenting PFAS contamination.

---

[65] In 2022, the PA Game Commission sampled deer in Tyler State Park in the southeastern part of the state.  A liver sample found three PFAS compounds detected at levels above the reporting limit. https://www.lancasterfarming.com/farming-news/deer-appear-to-be-in-the-clear-for-forever-chemicals/article_9190ee0e-c0cd-11ec-b13f-c737065f5114.html

248.    For example, the Municipal Authority of Westmoreland County ("MAWC") found PFAS contamination traceable to AFFF in its water supplies and surrounding natural resources at levels above the EPA's 2016 HAL.  PFAS-containing AFFF was used for decades in the areas surrounding MAWC's water supplies, including in a 2021 fire.  The MAWC conducted sampling in August 2021 showing high PFAS concentrations of which PFOA/PFOS concentrations were 111 ppt at consumers' taps and at 650 ppt in the systems' hydrant taps.

249.    As another example, described further below, Penn State University Airport has documented PFAS-containing AFFF contamination.  In the nearby university town, the State College Borough Water Authority has found PFOS and PFOA in its drinking water at levels above EPA's 2016 HAL.

250.    As yet another example, the Pennsylvania municipality of Coraopolis is the home of the Air National Guard in Pittsburgh where AFFF was used for decades.   The Coraopolis Water and Sewer Authority found PFAS in its drinking water at concentrations above EPA's 2016 HAL.

251.    Another example can be found in Middletown Borough, a municipality which is home to the Harrisburg International Airport.  The Middletown Borough Water Authority found concentrations of PFOA and PFOS in its water supply above EPA's 2016 HAL.

252.    The Commonwealth has incurred costs in connection with

investigating and protecting the public and public natural resources from potential contamination at these other sites, including costs incurred in connection with sampling. The Commonwealth may incur additional costs in connection with AFFF contamination at these sites, including costs associated with the continued investigation and possible remediation efforts. Additionally, the Commonwealth's continuing investigations may reveal that its public natural resources have been injured at or around these sites. Defendants should be required to reimburse the Commonwealth for these initial costs and all such future costs plus any natural resource damages.

(d) AFFF Manufacturing Site

253.    Groundwater and soil monitoring at an AFFF manufacturing facility in West Chester, Pennsylvania demonstrated high levels of PFAS contamination, with at least 70 sample results significantly above the now-superseded 2016 EPA HAL for PFOA and PFOS. In addition, PFAS compounds were detected in the nearby Goose Creek. As of the filing of this complaint, sampling is ongoing at this site. Additional AFFF manufacturing contamination sites are expected to be discovered.

(e)    Other sites

254.    In addition to the above, the Commonwealth has spent significant

83

sums related to a variety of site-specific efforts to assess, investigate, and implement remediation plans for AFFF contamination at sites throughout the Commonwealth.

255. None of these expenditures would have been necessary absent defendants' sale and dissemination of PFAS-containing AFFF, which when used as intended, inevitably contaminates public natural resources and endangers people, animals and the environment.

256. These site-specific expenditures include but are not limited to the following sites:

- Chester County, the National Foam defendants' site: PFAS at and surrounding the National Foam defendants' AFFF manufacturing facility in West Chester, PA has been found in the groundwater and local surface waters at levels above EPA's 2016 HAL. Aqua Pennsylvania, Inc.'s sampling results showed PFOA and PFNA concentrations. U.S. EPA sampling results from this same area confirmed Aqua Pennsylvania's results. Further sampling required by PA DEP continues to be conducted at this site.

- Bucks County, Ridge Run PA Hazardous Sites Cleanup Program (" HSCA") site: In November 1986, a tire fire occurred at this site. According to reports, Willow Grove Naval Station sent foam spraying trucks to help put out the fire. In 2016, the local water supplier, North Penn Water Authority, detected AFFF-related PFAS in its wells that exceeded EPA's 2016 HAL, and the impacted wells were taken off-line. Fifteen residential drinking water wells contained PFAS above the 2016 HAL; DEP installed carbon filtration systems or provided bottled water. PA DEP is conducting ongoing groundwater monitoring and expanded site investigations. An interim response is pending to install whole-house carbon treatment at impacted homes. PA DEP has expended more than $689,174.63 at this site. (This does not include certain not yet calculated oversight expenses and other PA DEP expenses).

- Penn State former fire training site and airport: In a community near the University Park Airport, Benner Township, Centre County, PA, firefighting

foam was identified as a source of PFAS contamination. PA DEP has tested homes in the area; at least 41 of 50 private drinking water wells contained concentrations of PFAS, many exceeding the current 2022 EPA HALs. PA DEP has been providing bottled water to at least nine households. In addition, PA DEP's public water supply well tests indicated that three businesses near University Park Airport had high levels of PFAS (PFOS and PFOA).

- Benner Township HSCA site:  In connection with the investigations of the above University Park Airport contamination, PFAS related to AFFF usage was detected in public water supply entry points that exceeded the EPA 2016 HALs. To date, PA DEP has expended more than $100,000.00 at this site. (This does not include certain not yet calculated oversight expenses and other PA DEP expenses.)

- Delaware County:  At three sites including a fire station and fire company training facilities in Delaware County, groundwater and soil samples were collected and concentrations of PFOA and PFOS exceeded the 2022 EPA HALs.

- Easton Road HSCA Site, Bucks County:  In connection with this HSCA site, PFAS were detected in public water supply wells and private wells that exceeded the 2016 EPA HALs.  The impacted public water supply was taken off-line. Eight private wells were impacted by PFAS contamination and PA DEP has been providing bottled water or in-house treatment. PA DEP continues to monitor the groundwater and conducts investigations at this site. To date, PA DEP has expanded $94,980.94 at this site. (This does not include certain not yet calculated oversight expenses and other PA DEP expenses.)

257.    The Commonwealth may incur additional costs in connection with AFFF contamination at these sites, including costs associated with the continued investigation and possible remediation efforts.  Additionally, the Commonwealth's continuing investigations may reveal that its public natural resources have been injured at or around additional sites.

258.    Defendants should be required to reimburse the Commonwealth for these initial costs and all such future costs plus any natural resource damages.

### 3. COMMONWEALTH RESPONSE

259.    The Commonwealth has spent significant time, effort and money in a variety of efforts to assess, investigate and implement strategies designed to reduce or eliminate PFAS contamination.

260.    In September 2018, Governor Tom Wolf formed a PFAS Action Team which has been taking steps to address PFAS contamination, including developing a comprehensive response to identify and eliminate sources of contamination, ensure drinking water is safe, manage environmental contamination, review gaps in data and oversight authority, and recommend actions to address those gaps. The PFAS Action Team released its initial Report in December 2019.

261.    In April 2019, the PA DEP announced and commenced a PFAS sampling plan to test water taken from more than 300 public water supplies with elevated potential for contamination, based on proximity to common sources of PFAS such as military bases, fire training sites, landfills and manufacturing facilities. The PA DEP budgeted more than $500,000 for the first round of sampling.  PA DEP has now completed this sampling.

262.    The PA DEP is investigating and remediating numerous PFAS contaminated sites.  PA DEP has been and will continue to address contaminated

sites and has established cleanup remediation standards for PFOA, PFOS and PFBS.

263.    In addition, on January 14, 2023, the Commonwealth finalized state drinking water standards for PFOA and PFOS which will soon be applicable in Pennsylvania instead of the U.S. EPA health advisory levels for PFOA and PFOS.[66] Pennsylvania sets standards of 14 ppt for PFOA and 18 ppt for PFOS.  As stated above, in March 2023, U.S. EPA proposed standards for six PFAS, including PFOA and PFOS, of 4 ppt each; PA DEP will incorporate the federal standards when the standards are finalized.

264.    As a part of PA DEP's process of developing the Commonwealth's PFAS drinking water standards, PA DEP secured additional toxicology resources to assist it and developed and conducted a PFAS sampling plan to generate statewide occurrence data. On April 16, 2021, DEP released a copy of its Evaluation Report (MCLG Drinking Water Recommendations for PFAS Report) including an independent review of data, science and studies used to develop a recommended maximum contaminant level goal ("MCLG") for select PFAS.[67]

265.    As described above, in 2019, PA DEP conducted an extensive surface water sampling survey together with the USGS, taking samples from

---

[66] 53 Pa. B. 333 (January 14, 2023).
[67] A MCLG is an unenforceable maximum contaminant level goal developed based on health effects and does not take into consideration other statutory factors such as limitations with analytical methods and available treatment technologies and costs.

throughout the Commonwealth and publicly reported results in March 2021. The results show many locations with PFAS concentrations above 20 ppt for total PFAS – a level above the 2022 U.S. EPA HAL. Many of the sampling sites are in close proximity to airports.

266.    PA DOH is participating in a health monitoring study being conducted in southeastern Pennsylvania. The study is designed to characterize PFAS exposure in the affected population using biomonitoring. In its Health Pilot Test Results, released in April 2019, the blood samples showed levels of PFAS in the serum of residents of the area around Willow Grove exceeding the national average. The blood serum PFAS levels significantly increased with the length of residence in the area. Private well water users had higher levels than public water users. The U.S. Center for Disease Control ("CDC") and an association of state health officials are expanding on the PA DOH's project to include further testing of the original participants in these communities and urine, water and household dusts analyses. In addition, the CDC is collaborating with the PA DOH to produce an initial review of the state cancer registry data for communities around the Willow Grove Military facilities.

267.    The Pennsylvania Department of Community and Economic Development and other Commonwealth agencies together with Governor Wolf responded to the PFAS contamination by approving numerous grants to the towns

88

and counties impacted by Willow Grove Military Facilities' PFAS-containing AFFF

contamination. The state monies are being provided to fund a variety of efforts to

remediate the impact of PFAS contamination in the contaminated areas.

268.    Additional Commonwealth expenditures are ongoing toward

providing clean drinking water for residents impacted by the Willow Grove Military

Facilities.

269.    Additional Commonwealth agencies in the PFAS Task Force have

responsibilities and have incurred expenses related to investigating PFAS

contamination from AFFF products.

270.    The Commonwealth anticipates that as comprehensive federal and

state standards are developed for PFAS, the Commonwealth will incur additional

costs related to retrofitting or upgrading water infrastructure, including drinking

water and wastewater treatment systems, in order to manage, remove, control and

reduce the presence of PFAS contamination from defendants' AFFF.

## VI.    CAUSES OF ACTION

COUNT ONE
VIOLATIONS OF UNFAIR TRADE PRACTICES AND CONSUMER
PROTECTION LAW AGAINST DEFENDANTS

1.    The Commonwealth incorporates the preceding paragraphs as

though they were fully set forth herein.

2.    The Pennsylvania Consumer Protection Law was in effect at all

times material hereto.

3.    Defendants are each a person as that term is defined pursuant to

Section 201-2 of the Consumer Protection Law, 73 P.S. § 201-2.

4.    Section 3(a) of the Consumer Protection Law, 73 P. S. § 201-

3(a), provides, in pertinent part:

> Unfair methods of competition and unfair or deceptive acts or
> practices in the conduct of any trade or commerce as defined by sub
> clauses (i) through (xxi) of clause (4) of section 2 of this act ... are
> hereby declared unlawful.

5.    Section 4 of the Consumer Protection Law, 73 P.S. § 201-4,

provides that whenever the Attorney General has reason to believe that any person is

using or is about to use any method, act or practice declared by Section 3 of the Act

to be unlawful, and that proceeding would be in the public interest, he may bring an

action in the name of the Commonwealth against such person to restrain by

temporary or permanent injunction the use of such method, act or practice.

6.    Defendants' acts and practices related to their PFAS resulted in

widespread use of their products in Pennsylvania and such practices had and have a

likelihood to deceive, mislead and confuse, violating the Consumer Protection Law

for one or more of the following reasons.

7.    By reason of the foregoing, defendants misrepresented the nature

of their products as safe, nontoxic, biodegradable and as if their products did not

present a threat to the environment or human health and were and/or are reasonably
safe for their intended use when in fact defendants knew this was not the case.

8.    Defendants' PFAS products were defective in design as they were
not reasonably safe at the time the products left defendants' control. These products
were defective when they left defendants' hands, and these defects harmed the public
and the Commonwealth's public natural resources.

9.    By concealing, misrepresenting and/or deliberately omitting
correct scientifically supported contrary evidence concerning the toxicity and
harmfulness of their PFAS products, defendants offered and sold a product that was
materially different from what it purported to be in the marketplace.

10.    Despite knowledge of the harms their products could cause to
public health and the public natural resources of Pennsylvania, defendants never
informed or warned the Commonwealth of these foreseeable harms and affirmatively
withheld that information and/or distorted their knowledge, disseminated false,
misleading and confusing information adversely affecting the Commonwealth's
responsibility for the wellbeing of its citizens and its public natural resources.

11.    Defendants disseminated, marketed, advertised and otherwise
distributed deceptive, confusing and misleading information in literature, brochures,
sales documents to distributors, users and the general public of their PFAS that
represented that their PFAS products were safe and did not require any special

handling or precautions to protect the environment or the groundwater and that the products was non-toxic when in fact defendants knew that their PFAS posed environmental risks and public health hazards.

12.    Defendants' PFAS products did not have the characteristics or qualities represented in the disseminated information, including in literature, brochures, and sales documents.

13.    Defendants' material omissions, misrepresentations and unfair and deceptive practices relating to distribution and sale and use of their PFAS products was intended to and did deceive, mislead and confuse the public, including distributors, purchasers and users who relied on the information defendants provided when purchasing, storing, distributing and using the products.

14.    Had defendants provided adequate warning about the hazards associated with their PFAS products, the Commonwealth and other users of their PFAS products could have heeded those warnings.

15.    Defendants continue to make false statements about their PFAS products.

16.    As a result of defendants' acts and/or omissions, their PFAS products were widely used and are or likely are still being used in Pennsylvania causing wide-spread contamination resulting in Pennsylvanians consuming water contaminated by defendants' products and contamination of the Commonwealth's

public natural resources. The Commonwealth has incurred and will incur costs and

expenses related to contamination and injury of the Commonwealth's public natural

resources, including surface water, groundwater and drinking water, for which

defendants are liable.

17.    The foregoing acts and practices constitute unfair methods of

competition and unfair or deceptive acts or practices in the conduct of trade or

commerce in violation of the Consumer Protection Law, 73 P.S. § 201-3, as defined

by Section 201-2(4) by, among other things:

- Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services;

- Causing likelihood of confusion or misunderstanding as to affiliation, connection or association with, or certification by, another;

- Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he does not have;

- Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another; and

- Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding.

73 P.S. §§ 201-2(4) (ii), (iii), (v), (vii), and (xxi)

18.    The Commonwealth alleges that all of the practices described

above were performed willfully.

19.    The Commonwealth believes that the public interest is served by

seeking before this Court a permanent injunction to restrain the methods, acts and practices described herein as well as seeking restitution for consumers, including the Commonwealth, and civil penalties for violations of the law. The Commonwealth believes that citizens of the Commonwealth are suffering and will continue to suffer harm unless the acts and practices complained of herein are permanently enjoined.

**WHEREFORE**, in addition to the Prayer for Relief below in this Complaint, the Commonwealth respectfully requests this Honorable Court to:

A. Enter declaratory judgment determining and declaring defendants' methods, acts, practices and conduct as described above to be in violation of the Consumer Protection Law;

B. Enter a permanent injunction ordering and restraining defendants, each of its agents, successors, assigns, and employees acting directly or through any corporate device from engaging in the aforementioned acts, practices, methods of competition, or any other practice violative of the Consumer Protection Law;

C. Direct defendants to comply with the Consumer Protection Law and any amendments thereto;

D. Enter an order directing defendants, pursuant to Section 201-8(b) of the Consumer Protection Law, to pay civil penalties in the amount of One

Thousand Dollars ($1,000.00) for each and every violation of the Consumer

Protection Law, which will increase to Three Thousand Dollars ($3,000.00)

for each violation involving a victim sixty (60) or older;

E. Direct defendants to render an accounting of all moneys obtained as result

of their violations of the Consumer Protection Law;

F. Enter an order pursuant to Section 4.1 of the Consumer Protection Act, 73

P.S. Section 201-4.1, requiring defendants to  restore to all persons in

interest (which includes the Commonwealth) any moneys or property which

defendants may have acquired by means of their violations of the Consumer

Protection Law and to disgorge and forfeit all profits they have derived as a

result of their unlawful, unfair and deceptive acts and practices as set forth

in this Complaint;

G. Direct defendants to forfeit their right or franchise to engage in business

within the Commonwealth of Pennsylvania until such time as all monies

have been paid for restitution, costs, and civil penalties;

H. Direct defendants to pay damages for injury to the Commonwealth's public

natural resources, including the economic impact to the Commonwealth and

its residents from loss of use, value, benefits, ecological services, or other

injuries resulting from the conduct alleged herein;

I. Enter an award of past, present, and future costs to investigate, assess,

analyze, monitor, remediate, restore, and/or replace public natural resources injured due to defendants' conduct;

J.  Enter a judicial determination that each defendant is liable for future costs related to the investigation, remediation and removal of each defendant's ·PFAS from Commonwealth's public natural resources;

K.  Award the Commonwealth costs and reasonable attorney's fees incurred in prosecuting this action, together with prejudgment interest to the full extent permitted by law;

L.  Provide such other relief as the Court may deem necessary and appropriate.

COUNT TWO
VIOLATIONS OF THE PENNSYLVANIA UNIFORM
VOIDABLE TRANSFERS ACT
ACTUAL FRAUDULENT TRANSFER IN RELATION TO THE CHEMOURS
SPINOFF (OLD DUPONT, CHEMOURS, CORTEVA, AND NEW DUPONT) –

20.  Plaintiff realleges and incorporates by reference all allegations set forth in the preceding paragraphs.

21.  The Uniform Voidable Transactions Act ("UVTA") has been adopted in the Commonwealth of Pennsylvania at 12 Pa. C.S.A. §5101 *et seq.*

22.  The UFTA defines the term "creditor" as a "person that has a claim;" and defines the term "claim" as "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." § 5101(b).

96

23. Pursuant to 12 Pa. C.S.A. § 5104 (a), "[a] transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation incurred, if the debtor made the transfer or incurred the obligation: (1) with actual intent to hinder, delay, or defraud any creditor of the debtor [.]"

24. At all relevant times, the Commonwealth has been and continues to be a creditor of Chemours and Old DuPont.

25. As detailed above, Chemours participated in the undertakings of Old DuPont, including its establishment as a wholly owned subsidiary and the corresponding transfer of significant assets from Chemours to Old DuPont, including the $3.9 billion dividend, in exchange for which Chemours assumed substantial liabilities. Chemours and Old DuPont both clearly understood that Old DuPont had been sued before and knew or should have known that Old DuPont faced significant additional liabilities arising in connection with its PFAS products.

26. The transfer of assets from Chemours and corresponding transfer of liabilities from Old DuPont was clearly beneficial for Old DuPont and detrimental to Chemours.

27. Pursuant to the Pennsylvania Uniform Transactions Act 12 Pa. C.S.A. § 5104 (a)(1), the Commonwealth is entitled to void the transfer of assets from Chemours and recover property or value transferred to Old DuPont.

28.    Chemours engaged in these proceedings with the actual intent to hinder, delay, and defraud any creditor of the debtor including the Commonwealth.

29. ·    As described above, Corteva and New DuPont apparently assumed Old DuPont's actual fraudulent transfer liability.

**WHEREFORE**, in addition to the Prayers for Relief above and below in this Complaint, the Commonwealth respectfully requests this Honorable Court to

A. pursuant to the Pennsylvania Uniform Voidable Transactions Act 12 Pa. C.S.A. § 5104(a)(1), void the transfer of assets from Chemours and recover property or value transferred to Old DuPont.

COUNT THREE
VIOLATIONS OF THE PENNSYLVANIA UNIFORM
VOIDABLE TRANSFERS ACT
CONSTRUCTIVE FRAUDULENT TRANSFER IN RELATION TO THE
CHEMOURS SPINOFF (OLD DUPONT, CHEMOURS, CORTEVA, AND
NEW DUPONT)

30.    Plaintiff realleges and incorporates by reference all allegations set forth in the preceding paragraphs.

31.    The Uniform Voidable Transactions Act ("UVTA") has been adopted in the Commonwealth of Pennsylvania at 12 Pa. C.S.A. §5101 *et seq.*

32.    The UFTA defines the term "creditor" as a "person that has a claim;" and defines the term "claim" as "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured,

98

unmatured, disputed, undisputed, legal, equitable, secured or unsecured." § 5101(b).

33. Pursuant to the UFTA's constructive fraudulent transfer provisions, 12 Pa. C.S.A. § 5104 (a) and (a)(2), "[a] transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation incurred, if the debtor made the transfer or incurred the obligation:

***

(2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

(i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
(ii) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due."

34. At all relevant times, the Commonwealth has been and continues to be a creditor of Chemours and Old DuPont.

35. Chemours did not receive reasonably equivalent value from Old DuPont in exchange for the transfers and assumed liabilities undertaken by Chemours.

36. The transfer of assets made by Chemours together with its assumption of liabilities from Old DuPont, were made to benefit and did indeed inure to the benefit of Old DuPont.

37. As stated above, until the spinoff was complete, Old DuPont was

in a position to, and did exercise complete control over Chemours.

38.    Chemours made the transfer of assets to, and assumed the liabilities of, Old DuPont when it was engaged or about to engage in a business for which the remaining assets were unreasonably small in relation to the business.

39.    At the time that the transfers of assets from Chemours were made and Old DuPont's liabilities were assumed, both Chemours and Old DuPont intended Chemours to incur or believed or reasonably should have believed that Chemours would incur debts beyond its ability to pay as they became due.

40.    12 Pa. C.S.A. § 5104 (b) states that "[in] determining actual intent under subsection (a), consideration may be given, among other factors, to whether ...

\*\*\*

(4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
\*\*\*
(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred [.]"

41.    Old DuPont had been sued prior to the transfer and knew or reasonably should have known that additional suits would be filed.

42.    Chemours did not receive reasonably equivalent consideration from Old DuPont in exchange for the assets it transferred and the extensive liabilities it assumed.

43.    At the time of the exchange of assets and transfer of liability, Chemours was insolvent or became insolvent due to the transfer of assets and the assumption of Old DuPont's liabilities.

44.    At the time of the transfers and up to the time of the Chemours spinoff, Old DuPont exercised absolute control over Chemours and forced the transfer of  Chemours' assets to Old DuPont in exchange for assuming its liabilities. As a result, the transactions inured solely to the benefit of Old DuPont and was exceptionally detrimental to Chemours. The Commonwealth has been harmed as a result of these transactions.

45.    Pursuant to the Pennsylvania Uniform Transactions Act 12 Pa. C.S.A. § 5104 (a)(1), the Commonwealth is entitled to void the transfer of Chemours' assets and to recover property or value transferred to Old DuPont.

46.    As described above, New DuPont and Corteva apparently assumed Old DuPont's constructive fraudulent transfer liability.

**WHEREFORE**, in addition to the Prayer for Relief above and below in this Complaint, the Commonwealth respectfully requests this Honorable Court to

A. pursuant to the Pennsylvania Uniform Voidable Transactions Act 12 Pa. C.S.A. § 5104(a)(1), void the transfer of assets from Chemours and recover property or value transferred to Old DuPont.

101

COUNT FOUR
VIOLATIONS OF THE PENNSYLVANIA UNIFORM
VOIDABLE TRANSFERS ACT

ACTUAL FRAUDULENT TRANSFER IN RELATION TO THE DOW-
DUPONT MERGER AND SUBSEQUENT RESTRUCTURINGS, ASSET
TRANSFERS, AND SEPARATIONS (OLD DUPONT, NEW DUPONT, AND
CORTEVA)

47.     The Commonwealth realleges and incorporates by reference all
allegations as set forth in the preceding paragraphs.

48.     The Uniform Voidable Transactions Act ("UVTA") has been
adopted in the Commonwealth of Pennsylvania at 12 Pa. C.S.A. §5101 *et seq.*

49.     The UFTA defines the term "creditor" as a "person that has a
claim" and "claim" as "a right to payment, whether or not the right is reduced to
judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed,
undisputed, legal, equitable, secured or unsecured." § 5101(b).

50.     Pursuant to 12 Pa. C.S.A. § 5104 (a), "[a] transfer made or
obligation incurred by a debtor is voidable as to a creditor, whether the creditor's
claim arose before or after the transfer was made or the obligation incurred, if the
debtor made the transfer or incurred the obligation: (1) with actual intent to hinder,
delay, or defraud any creditor of the debtor [.]"

51.     At all relevant times, the Commonwealth has been and continues
to be a creditor of Old DuPont and Chemours.

52.    Following the DowDuPont merger, three new companies emerged: Corteva, New Dow and New DuPont.  Corteva and New DuPont received valuable assets and business lines from Old DuPont.

53.    The transfers from Old DuPont were made for and inured to the benefit of Corteva and/or New DuPont.

54.    At the time of transfers from Old DuPont, New DuPont was in a position to, and did in fact, control and dominate Old DuPont and Corteva.

55.    All three companies acted with the intent to hinder, delay and defraud existing and prospective creditors.

56.    As a creditor, these transactions caused harm to the Commonwealth.

57.    As it did with the Chemours spinoff, Old DuPont undertook these steps to prevent potential creditors or other parties from gaining access to its assets to satisfy liabilities it had incurred.

58.    These actions caused harm to the Commonwealth and others as a consequence.

59.    Pursuant to the Pennsylvania Uniform Transactions Act 12 Pa. C.S.A. § 5104 (a)(1), the Commonwealth is entitled to void the transfer of assets from Old DuPont and recover property or value transferred to Corteva and New DuPont.

103

**WHEREFORE**, in addition to the Prayer for Relief above and below in this Complaint, the Commonwealth respectfully requests this Honorable Court to

    A. pursuant to the Pennsylvania Uniform Voidable Transactions Act 12 Pa. C.S.A. § 5104(a)(1), void the transfer of assets from Old DuPont and recover property or value transferred to Corteva and New DuPont; and,

    B. enjoin New DuPont and Corteva, as transferees, from distributing, transferring, capitalizing, or otherwise disposing of any proceeds from the sale of any business lines, segments, divisions, or other assets that formerly belonged to Old DuPont, and establish a constructive trust over such proceeds for the benefit of the Commonwealth.

### COUNT FIVE
### VIOLATIONS OF THE PENNSYLVANIA UNIFORM VOIDABLE TRANSFERS ACT
### CONSTRUCTIVE FRAUDULENT TRANSFER IN RELATION TO THE DOWDUPONT MERGER AND SUBSEQUENT RESTRUCTURINGS, ASSET TRANSFERS, AND SEPARATIONS (OLD DUPONT, NEW DUPONT, AND CORTEVA)

60.    The Commonwealth realleges and incorporates by reference all allegations as set forth in the preceding paragraphs.

61.    The Uniform Voidable Transactions Act ("UVTA") has been

104

adopted in the Commonwealth of Pennsylvania at 12 Pa. C.S.A. §5101 *et seq.*

62.    The UFTA defines the term "creditor" as a "person that has a claim" and "claim" as "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." § 5101(b).

63.    At all relevant times, the Commonwealth has been and continues to be a creditor of Old DuPont.

64.    Pursuant to 12 Pa. C.S.A. §§ 5104 (a) and (a)(2), "[a] transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation incurred, if the debtor made the transfer or incurred the obligation:

***

(2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

(i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(ii) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due."

65.    Old DuPont did not receive reasonably equivalent value for the assets transferred from Corteva and New DuPont.

66.    At the time that Old DuPont made the transfers, New DuPont

105

exercised complete control over Old DuPont and Corteva.

67.     At the time the Old DuPont transfers were made, the transfers were beneficial to Corteva and/or New DuPont.

68.     At the time the Old DuPont transfers were made, New DuPont was in a position to, and in fact, did control and dominate Old DuPont and Corteva.

69.     At the time the Old DuPont transfers, it was engaged in or about to be engaged in a business for which its remaining assets were unreasonably small in relation to its business.

70.     Old DuPont was insolvent or became insolvent as a result of the transfers.

71.     At the time that Old DuPont made the transfers, it intended to incur or believed or reasonably should have believed that is would incur debts beyond its ability to pay as they became due.

72.     The Commonwealth has been harmed as a result of Old DuPont's transfers.

73.     Pursuant to the Pennsylvania Uniform Voidable Transactions Act, 12, PA. C.S.A. § 5104(a)(2), the Commonwealth is entitled to void the transfer of assets from Old DuPont to Corteva and New DuPont and recover property or value transferred to New DuPont and Corteva.

**WHEREFORE**, in addition to the Prayer for Relief above and below in this

106

Complaint, the Commonwealth respectfully requests this Honorable Court to

    A. pursuant to the Pennsylvania Uniform Voidable Transactions Act 12 Pa. C.S.A. § 5104(a)(1), void the transfer of assets from Old DuPont  and recover property or value transferred to Corteva and New DuPont; and,

    B. enjoin New DuPont and Corteva, as transferees, from distributing, transferring, capitalizing, or otherwise disposing of any proceeds from the sale of any business lines, segments, divisions, or other assets that formerly belonged to Old DuPont, and establish a constructive trust over such proceeds for the benefit of the Commonwealth.

107

## VII. JURY DEMAND

The Commonwealth hereby demands a jury trial for all issues so triable.

Respectfully Submitted,

COMMONWEALTH OF PENNSYLVANIA
OFFICE OF ATTORNEY GENERAL

MICHELLE A. HENRY
Attorney General

JAMES A. DONAHUE, III
Executive Deputy Attorney General

Date: May 30, 2023        By:   /s/ Neil F. Mara
Neil F. Mara
Chief Deputy Attorney General
PA. Attorney ID No. 64895
Cheryl Jacobs
PA. Attorney ID No. 64913
Ann R. Johnston
PA. Attorney ID No. 204673
Office of Attorney General
Public Protection Division
1000 Madison Ave.
Suite 310
Norristown, PA 19403
Telephone: (717) 787-3391
Email: nmara@attorneygeneral.gov

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA )
by ATTORNEY GENERAL )
MICHELLE A. HENRY )
and Representing the Department of )
Environmental Protection, )
)
PLAINTIFFS, )
) CIVIL ACTION No. ___
v. )
) COMPLAINT
EIDP, INC., *formerly known as* I.E. DU PONT )
DE NEMOURS AND COMPANY, THE )
CHEMOURS COMPANY, THE CHEMOURS )
COMPANY FC, LLC, CORTEVA, INC., )
THE DUPONT DE NEMOURS, INC., )
)
DEFENDANTS. )

## CERTIFICATE OF COMPLIANCE

I certify that this filing complies with the provisions of the *Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts* that require filing confidential information and documents differently than non-confidential information and documents.

Date: May 30, 2023          By:    /s/ Neil F. Mara
                                    Neil F. Mara
                                    P.A. Attorney ID No. 64895
                                    Office of Attorney General
                                    1000 Madison Ave., Suite 310
                                    Norristown, PA 19403
                                    nmara@attorneygeneral.gov

109

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA<br>by ATTORNEY GENERAL<br>MICHELLE A. HENRY<br>and Representing the Department of<br>Environmental Protection,<br><br>        PLAINTIFFS,<br><br>        v.<br><br>EIDP, INC., *formerly known as* I.E. DU PONT<br>DE NEMOURS AND COMPANY, THE<br>CHEMOURS COMPANY, THE CHEMOURS<br>COMPANY FC, LLC, CORTEVA, INC.,<br>THE DUPONT DE NEMOURS, INC.,<br><br>        DEFENDANTS. | CIVIL ACTION No. ___<br><br>COMPLAINT |

## <u>VERIFICATION</u>

I, Cheryl Jacobs, hereby state that I am a Senior Deputy Attorney General with the Pennsylvania Office of Attorney General, Special Litigation Section and am authorized to make this verification on behalf of the Plaintiffs in the within action. I hereby verify that the facts set forth in the foregoing Complaint are true and correct to the best of my knowledge or information and belief. I understand that the statements contained herein are subject to the penalties of Pa. C.S. Section 4904 relating to unsworn falsifications to authorities.

Date: May 30, 2023

By:   */s/* Cheryl P. Jacobs
      Cheryl P. Jacobs, PA I.D. No. 64913
      Pennsylvania Office of Attorney General
      1000 Madison Avenue #310
      Norristown, PA 19403
      PA I.D. No. 64913
      cjacobs@attorneygeneral.gov

110